David B. STENSON, Plaintiff-Respondent,

v.

LACLEDE GAS COMPANY, Defendant-Appellant.

Nos. 37472, 37473.

Missouri Court of Appeals, St. Louis District, Division Three.

May 31, 1977.

Paul B. Hunker, Jr., Morris E. Stokes, St. Louis, for defendant-appellant.

Cox, Moffitt & Cox, Dallas W. Cox, Jr., St. Louis, for plaintiff-respondent.

KELLY, Presiding Judge.

These causes involve cross-appeals, one, an appeal by the defendant in the trial from an order of the trial court overruling the defendant's motion for a judgment for the defendant in accordance with its motion for directed verdict at the close of the plaintiff's case or, in the alternative, for a new trial, and the other, the plaintiff's appeal from the trial court's order directing a verdict for the defendant on the issue of punitive damages.

The parties on appeal shall be referred to as plaintiff and defendant, the positions they were in at the trial level.

The plaintiff's evidence was that in December, 1972, he and his brother, James, lived on Whispering Winds Road in a mobile home park in St. Charles County and plaintiff was employed by his brother in a mobile home repair business. On December 29, 1972, plaintiff was at his brother's home located approximately one block from where the occurrence which gives rise to this litigation took place. It had been snowing that day, and two or three inches of snow had accumulated on the ground. During the afternoon, at approximately 2:30 p. m., James Stenson was driving his 1971 Ford pick-up truck southwardly over Boschert Drive in St. Charles County with the plaintiff riding with him as a passenger. Boschert Drive is a two lane street and is paved with asphalt and chat. As he was proceeding southwardly at approximately 25 m. p. h. with his windshield wipers and defroster working, the pick-up truck came to a sudden stop. Plaintiff was thrown forward and struck his head against the windshield sustaining injuries to his neck

and back. James Stenson was also thrown forward into the windshield and the steering wheel. The steering wheel was cracked in two places by the impact. Plaintiff and his brother alighted from the pick-up truck and observed that the right rear wheel of the truck was completely under the ground, "clear up to the body, bottom of the body setting on the ground." They observed some rock in the "hole" and after the truck was pulled out of the "hole," they observed that the "hole" was about three feet deep from the level of the road to the level of the rock.

Both brothers testified that they had previously seen employees of the defendant digging a hole in the road where the truck sank into the "hole." The excavation was about 6 feet by 8 feet and 4–5 feet deep. James Stenson testified that the men worked there for two days approximately one week prior to the occurrence, and he observed the words "Laclede Gas" written on the shirts of some of the men so engaged and that he also saw the Laclede name imprinted on the side of three trucks at the work site. He had passed the construction site many times and on one occasion observed that the workers had dug a hole about four or five feet deep to hook up to a gas main. He also observed red flags and stringers circling the construction site. The plaintiff testified that these men filled the hole when they had finished working there, but he did not see what it was they put in the hole although he did see that there was rock on top, and that the rock was level with the surrounding surface. James Stenson testified that he did not see any of defendant's personnel at the work site the week prior to the occurrence. During the week prior to the occurrence there were no barricades, flags or warning lights around the former construction site. The next time James Stenson observed any of defendant's employees on the site was the Monday following the occurrence at which time he observed them filling the hole into which his pick-up truck had sunk with rock.

At the close of plaintiff's case the defendant offered no evidence but filed a Motion for a Directed Verdict, together with a similar motion directed to the plaintiff's claim for punitive damages. The former was overruled and the latter sustained. The cause was submitted to the jury and a verdict was returned for the plaintiff for $10,000.00. Defendant filed a Motion for Judgment in Accordance with its Motion for A Directed Verdict, or, in the alternative, for a new trial. Plaintiff filed a motion for new trial on the issue of punitive damages. The trial court overruled both parties' motions and timely notices of appeal were filed by the plaintiff and the defendant.[1]

Defendant's appeal shall be considered and disposed of first. Defendant's initial point is that the plaintiff did not make a submissible case for the jury. The thrust of this contention hinges on whether, at the time of the occurrence, there was an "excavation" in the road. Plaintiff's petition alleged that the motor vehicle in which plaintiff was riding fell into an "excavation" made by the defendant and that the negligence and carelessness of the defendant was (a) that the said "excavation" was a dangerous condition created by the defendant, (b) that the location of said "excavation" exposed persons lawfully using the roadway to an unreasonable risk of harm of falling into the "excavation," and (c) that the defendant failed and omitted to use ordinary care to take precautions to place barricades, ropes, flags, lights or other warning devices at or near the "excavation."

The cause was submitted to the jury under Instruction No. 2, which is as follows:

"INSTRUCTION 2

Your verdict must be for the plaintiff if you believe:

First, defendant created an *excavation* located in a public street or close thereto, and

1. Defendant has not, on appeal, directed the question of submissibility to the damages issue in the case and for that reason we believe no purpose would be served by relating in detail plaintiff's evidence in support of his claim for injuries, etc.

Second, that such *excavation* was so located in a public street or so close thereto that persons using the street in the exercise of ordinary care were exposed to a danger of falling into the *excavation*, and

Third, defendant knew or should have known of such danger, and

Fourth, defendant failed to use ordinary care to either barricade it or warn of it, and

Fifth, as a direct result of such failure plaintiff was injured.

The term 'ordinary care,' as used in this instruction, means degree of care that an ordinarily careful and prudent person would use under the same or similar circumstances. (MAI 22.02, modified, by plaintiff)." (Emphasis supplied)

Defendant's claim of error rests upon the definition of the word "excavation" as "a cavity formed by cutting, digging or scooping . . . an uncovered cutting in the earth."

Defendant, in its brief, admits that it did make an excavation in Boschert Drive in connection with its business of furnishing gas service to subscribers, but it contends that once the excavation was filled to the street surface it ceased being an excavation and any injuries plaintiff sustained were the result of the *subsidence* of the fill in what was formerly an excavation. Defendant bases its argument on the definition of "excavation" found in 23 C.J. at page 179 and in the case of *Bituminous Casualty Corporation v. Walsh & Wells*, 170 S.W.2d 117, 121 (Mo.App.1943). The definitions of the term "excavation" in these two sources is too narrow and technical to be controlling here.

The definition quoted from 23 C.J. at page 179 failed to include that portion of the definition which evidenced the technical nature in which it was used there, viz. "*in distinction from a covered cutting or tunnel*." We shall demonstrate hereafter that this technical definition of the term is peculiar to the engineering profession, and inappropriate to the facts in this case.

The Court in *Bituminous Casualty Corporation v. Walsh & Wells,* supra, distinguished the terms "excavation" and "tunnelling" in construing whether an exclusion from coverage under a contract of insurance barred the defendants from recovering from plaintiff on their counterclaim a sum they had paid to the owner of a building on property which was damaged when defendants were constructing a sewer under the building and the building was thereby damaged. The exclusion in the insurance policy precluded from coverage collapse of or structural injury to any building adjacent to premises where the insured's operations were carried on due to "excavation" below the natural surface of the ground. It was conceded that the tunnelling underneath the building was what caused the injury to the building which was the basis for the claim. In distinguishing the word "tunnel" from "excavation" the court, 170 S.W.2d l.c. 121[1] said:

"'Excavation' is defined in 23 Corpus Juris 179, as an uncovered cutting in the earth, in distinction from a covered cutting or tunnel. This, we think, is the common ordinary meaning of the word. A tunnel is not ordinarily spoken of as an excavation. Nor is the operation of constructing a tunnel spoken of as excavating. But however this may be, it is certain that the word as used in the provision under review here does not exclude from coverage injuries to the buildings or structures due to tunneling under them."

This definition is not, however, the only definition of the term "excavation" and is not the more broad definition we believe is applicable to this case as we shall hereinafter observe.

Our research has led us to the following definitions of the word "excavation."

"1 a: the act or process of excavating b : the removal of superposed material (as earth or buildings) from the remains or structures of an age or civilization earlier than the present 2 : a cavity formed by cutting, digging or scooping 3 : an uncovered cutting in the earth—distinguished from *tunnel* b : the material dug out in making a channel or cavity." *Webster's Third New International Dictionary.*

"1. Act or process of excavating.

2. A cavity formed by cutting, digging or scooping.

3. Engin. a. An uncovered cutting in the earth, in distinction from a covered cutting or tunnel."

*Webster's Standard International Dictionary.*

"1. The act or process of excavating, a making hollow or cleaning out by digging, scooping or cutting.

2. A cavity or hollow formed by scooping, cutting or digging. Engin. An open earth-cutting, as distinguished from a tunnel." *Funk and Wagnall's New Standard Dictionary.*

"The word 'excavation' is defined generally as meaning the act or process of excavating; a making hollow or cleaning out by digging, scooping or cutting; and it also means a cavity or hollow formed by cutting, digging or scooping.

"The word has two principal meanings, and in engineering an 'excavation' is an uncovered cutting in the earth, in distinction from a covered cutting or tunnel, while 'cavity' or 'hole' is the ordinary definition or the one usually employed, and it has been said that there is a vast difference between the scope of the ordinary definition and the engineering or scientific definition.

"In construction operations, the term has been said to have its plain and natural meaning of hollowing out or digging out and removing whatever material was encountered in order to expose the cavity required by plans and specifications, and to include the removal of rock or ledge." 32 A C.J.S. Excavation p. 856.

For decisions construing the term "excavation," see: *Orr Ditch & Water Co. v. Justice Court of Reno Tp.*, 64 Nev. 138, 178 P.2d 558, 560–561 (1947); *Commonwealth v. Ko-*

zak, 184 Pa.Super. 287, 133 A.2d 584, 586[2] (1957); *Rochez Bros. Inc. v. Duricka*, 374 Pa. 262, 97 A.2d 825, 827 (1953). The court in *Orr* noted the distinction when the word "excavation" is used in its ordinary sense and when it is used in the engineering or scientific sense. At 178 P.2d l.c. 561, the court stated: "It is apparent, therefore, that there is a vast difference between the scope of the ordinary definition and the engineering or scientific definition."

Plaintiff's cause of action sounds in negligence [2] and is based upon the failure of the defendant to use ordinary care to barricade or warn persons using the street of the excavation which was located in the street so that said persons were thereby exposed to danger of falling into the excavation. Obviously if, as defendant contends, there was no excavation to barricade or to warn persons using the street to beware of, plaintiff could not make a submissible case under his theory of negligence.

■ We believe that once a gas company has made an excavation in a public street for its own purposes that excavation continues to exist until such time as the gas company has fulfilled the duty cast upon it by the law to restore the public street to its normal condition and to take care of its work insofar as the rights of the public to the use of the street are concerned that such restoration is permanent in character. *Sudduth v. Kansas City Gas Co.*, 234 Mo. App. 527, 123 S.W.2d 589, 593[7] (1938), certiorari granted *State ex rel. Kansas City Gas Co. v. Shain*, 345 Mo. 233, 132 S.W.2d 1015 (1939); *Oklahoma Natural Gas Company v. Hancock*, 272 P.2d 450, 452[2] (Okl. 1954). Until such time as the street has been restored to its normal condition there is no error in continuing to refer to the area which has been excavated as an "excavation."

2. We mention this only because there is authority for the proposition that where one, without special authorization from the authorities renders the use of a public street hazardous to public use by doing anything upon or below the surface is guilty of a nuisance and the basis for liability under those circumstances is the wrongful act in rendering the public street hazardous; negligence is not an element. Since defendant offered no evidence we do not know from the record whether it had such special authorization. However, since plaintiff pled and submitted his case on the negligence theory we presume defendant had such authorization. 39 Am.Jur.2d Highways, Streets and Bridges, § 359, p. 743.

■ Whether defendant had fulfilled its duty to the public and the excavation it has admittedly created ceased to be an "excavation" was, we believe, a question for the jury. If we employ the term "excavation" in its ordinary sense, i. e. as a cavity formed by cutting, digging or scooping, and apply the presumption which arises that a condition once created continues to exist until the contrary is shown to defendant's admission that it had created an excavation in the public street, we must search the evidence in the record to ascertain if there is any evidence, direct or circumstantial, which would defeat plaintiff's claim that there was an excavation in the street at the time he was injured. *State ex rel. Senior Estates of Kansas City, Inc. v. Clarke*, 530 S.W.2d 30, 33[3] (Mo.App.1975).

As we have heretofore stated, defendant put on no evidence whatsoever. James Stenson's testimony was that when he passed by the site of this occurrence about a week prior to the incident he observed defendant's employees digging that hole and putting service in for 13 Boschert Drive, that these employees of the defendant worked there for approximately two days, and during that period they had flags and red stringers around the working area. In the week preceding the incident he continued to pass by the site to get his lunch and to return to his home in the evening. He also passed the site in the morning and again after lunch to return to work. In the week after the defendant's employees left the scene he observed no barricades, flags, warning lights or strings of any kind in the area. The excavation was off on the right-hand side of the road, halfway on Boschert Drive and halfway off the road, in a driveway. On cross-examination he testified that he saw these same employees of defendant trenching under the street, which street was 20 feet wide, and that he was on the road when the truck came to a sudden stop. He could not see the surface of the road because it was under three inches of snow at the time. However, prior to the time the right rear of the pick-up truck sank into the excavation, the right front wheel of the truck had gone over the excavation.

David Stenson, the plaintiff, testified and corroborated his brother's testimony that employees of the defendant had been seen in the week prior to December 29, 1972, digging a hole across the street from No. 13 Boschert Drive. He saw them four or five times a day—"every time I went out there." He also saw three or four Laclede Gas Company trucks there. He saw them over a period of a couple of days. The hole was on the right side of Boschert Drive. As he was riding as a passenger in his brother's truck he did not observe any hole in front of or to the side of the truck. The street was completely covered with snow although he could see the asphalt surface of the street in some places, but the ground on each side of the street could not be seen because of the snow. On cross-examination he testified that the defendant's employees had finished their work about a week prior to the date of the occurrence, December 29, 1972. When asked if they had filled up the hole when they finished, he replied, yes; but, he further testified, that he did not see what they had put in the hole, although he did see that there was "rock on the top," and it was then level with the surrounding surface. He did not recall driving over the area after this was done, because he did not use that route to get to and from where he lived in the mobile home court.

Both brothers testified that when they alighted from the truck after it had suddenly stopped, the truck was in a hole up to its axle so that one could hardly see the right rear wheel. After the truck was towed out of the hole they were able to determine that the hole was three feet deep from the level of the surface to the level of the rock in the hole.

Trial counsel for defendant, in cross-examining the plaintiff, inquired:

"Now, when your rear wheel hit this *excavation*, you went down; did the car or truck suddenly sink or what kind of a feeling did you experience?" (Emphasis supplied).

We conclude that from this evidence the plaintiff made a submissible case on whether there was an "excavation" at the site of this occurrence and the trial court did not err in denying defendant's motion for a directed verdict at the close of plaintiff's evidence nor in denying its motion for judgment in accordance with its motion for a directed verdict, or, in the alternative, for a new trial on this point. We rule this point against the defendant.

Defendant's final point is directed against the plaintiff's verdict director—Instruction No. 2—set out hereinabove. It contends that the instruction "contained or necessarily inferred facts required to be found which were unsupported by the evidence." These facts are (1) that the defendant created a dangerous condition that was an excavation in the street at the time of the alleged occurrence and (2) if plaintiff was injured, it was the result of a subsidence and his injuries would not have been caused by a failure to barricade or warn of an excavation. The thrust of defendant's argument in support of this point is essentially the same made in support of its first Point Relied On. In disposing of that point we have likewise disposed of this sub-point of defendant's second Point Relied On.

In support of this sub-point, defendant argues that if it was guilty of any negligence whatsoever it had to be its failure to fill what had been an excavation, and not the failure to barricade or warn of the excavation. While failure to fill an excavation properly could constitute a submission of negligence, we believe that it was not error to submit plaintiff's theory of failure to barricade or warn of an excavation. As we have held, defendants had a duty to restore the road to the same condition that it was before defendant made its excavation in the public street, and if it failed in this duty, then the excavation still existed, and if it did, then it was a jury question whether the failure to barricade or warn plaintiff of the excavation was the proximate cause of plaintiff's injuries. We rule this point against defendant.

Turning now to the plaintiff's appeal, he contends that the trial court erred in directing a verdict for the defendant on the issue of punitive damages. In support of this Point plaintiff relies on *Sharp v. Robberson*, 495 S.W.2d 394 (Mo. banc 1973) for the proposition that a party may, in the same case, recover both actual compensatory damages predicated on ordinary negligence, as well as punitive damages predicated upon the defendant's conduct which manifests such reckless indifference to the rights of others that the law will imply that an injury resulting from it was intentionally inflicted.

The evidence plaintiff contends entitled him to submit his case to the jury for punitive damages is the "leaving a partially unfilled (to the extent of some 3 feet) unfinished (i. e. no top layer of asphalt or concrete) excavation in wintertime without barricades, flashing lights, or other warning devices, when snow might well cloak the appearance of same and snow did so cloak same . . ." He argues that this conduct of the defendant involved a high degree of probability that harm will result to another even though there be no intent to injure.

The law with respect to punitive damages is that in order to justify the infliction of punitory damages for the commission of a tort, the act complained of must have been done wantonly or maliciously. It is where the act which might properly be characterized as negligence also manifests such reckless indifference to the rights of others that the law will imply that the injury resulting from it was intentionally inflicted; or, where there is conscious negligence tantamount to intentional wrongdoing, where the person doing the act or failing to act must be conscious of his conduct, and, though having no specific intent to injure, must be conscious, from his knowledge of surrounding circumstances and existing conditions, that his conduct will naturally or probably result in injury. *Sharp v. Robberson*, supra, l.c. 397.

The burden of proof on the question of punitory damages, like that on the issue

of negligence, was on the plaintiff and the holding that he made a submissible case on "ordinary negligence," i. e. the mere omission of the duty to exercise care, does not cause us to also hold that evidence made a submissible case on the issue of punitive damages.

We have held that plaintiff made a submissible case against the defendant on the issue of "ordinary negligence" because his evidence was that the defendant did not restore the public street to the same condition it was in prior to creating the excavation therein. Plaintiff's evidence was that to the naked eye it would appear that the excavation had been filled, but, of course, his evidence was also that he could not determine the weight-bearing capabilities of the fill under the subsurface because it was not visible to the naked eye. That it was not filled so that the public road was restored to the same condition it had been in prior to the making of the excavation was apparent from the fact that the right rear wheel of his brother's truck sank into the hole.

However, to make a case for punitory damages plaintiff had to do more. He adduced no evidence that the defendant knew that the excavation was not properly filled nor that the surface of the street was not restored, but nevertheless, did nothing about it. He did not produce any evidence that defendant's employees knew or had reason to know that by reason of the underlying soil, subsidence could be expected, nor that regular inspections of the site were not made by defendant after completion of its work to ascertain whether the filling in the excavation had subsided or the weight-bearing qualities of the underlying filling was insufficient but, nonetheless, did nothing to correct the condition.

Plaintiff relies on *Reel v. Consolidated Investment Co.*, 236 S.W. 43 (Mo.1921). In *Reel*, however, the defendant had knowledge that the elevator was dangerous unless the cables were renewed for one month prior to the date of the accident, but notwithstanding that knowledge it continued to operate the elevator until it fell with plaintiff therein when the two wire cables by which it was raised and lowered broke. It was in this context that the court held that the defendant, through its agent Reed, the defendant's engineer, not only knew the elevator cables were so worn and broken that they were likely to give away at any instant while in use, but that it also knew and appreciated the imminent danger necessarily incident to their further use; and that its failure to renew them during a period of six weeks was not, and under the circumstances could not have been, the result of mere inadvertence, but of an utter indifference to the rights of those whose lives and limbs were thereby daily and hourly imperiled, equivalent to intentional wrongdoing. The record in *Reel* is not subject to the infirmities of the record here, and for that reason *Reel* is inapposite.

The negligence which will support an award of punitive damages is more flagrant in nature than that which will support an award of compensatory damages for "ordinary negligence," i. e. the mere omission of the duty to exercise care. "Ordinary negligence" is the antithesis of willful or intentional conduct. *Sharp v. Robberson*, supra, l.c. 397. We hold that plaintiff's evidence did not support a submission on punitory damages and that the trial court did not err in directing a verdict for the defendant on that issue.

The judgment of the trial court is affirmed.

SIMEONE, C. J., and GUNN, J., concur.