Jim and Shirley MANZO, Appellants, Cross-Respondents,

and

Richard Bridgeman, Cross-Respondent,

v.

METRO NORTH STATE BANK and Betty J. Blaco, Respondents, Cross-Appellants.

Nos. WD 39605, WD 39686.

Missouri Court of Appeals, Western District.

Oct. 11, 1988.

Daniel M. Czamanske, Kansas City, S. Preston Williams, and Thomas E. Barzee, Jr., Williams & Barzee, of counsel, North Kansas City, for Manzo.

Robert F. Deis, Kansas City, for Bridgeman.

Michael H. Maher, Schulz, Bender, Maher & Blair, P.C., Kansas City, for Metro North Bank and Blaco.

Before NUGENT, P.J., and CLARK and KENNEDY, JJ.

CLARK, Judge.

Appellants Jim and Shirley Manzo, joined later by intervenor-respondent Richard

Bridgeman, brought this suit to forestall efforts by cross-appellant, Metro North State Bank, to collect from them the balance due on a note. The debt was that of a corporation, RBM, Inc., in which Jim Manzo and Bridgeman were stockholders, and was an obligation for which the Manzos and Bridgeman had assumed personal responsibility. The issue in the case is whether the bank may enforce liability upon the individuals over protests that the bank did not deal in good faith and impaired the value of collateral pledged to secure payment of the note. We find that the bank is entitled to prevail as against the guarantors and therefore affirm the trial court in part and reverse in part.

The loan giving rise to this dispute was in the amount of $160,000 borrowed from the bank July 31, 1981 by RBM. At the time, stockholders in the corporation were Manzo, Bridgeman and James Reynolds and James McCracken. Reynolds and McCracken are not parties to this case because Reynolds was released from liability by the bank at an earlier date and McCracken has made a settlement of the bank's claim against him.

When the loan was made, RBM gave the bank its promissory note and pledged all of the corporate assets as security for repayment. All of the stockholders also assumed personal liability and signed security agreements. The bank took deeds of trust on the Manzo, Reynolds and McCracken residences and Bridgeman pledged two certificates of deposit as added collateral.

RBM was apparently in financial difficulty throughout much of its existence and installment payments on the bank note were not always made currently when due. These difficulties culminated in September, 1985 when RBM declared bankruptcy. Although that event prompted the bank to resort to the Manzo and Bridgeman collateral, producing this suit, earlier transactions affecting the parties and the loan are the focus of claims here.

The first event material to the case occurred in 1982 when the business property of RBM was substantially damaged in a fire. The bank was named as a loss payee under the RBM fire insurance policy and, under the terms of the security agreement, the bank would have been entitled to appropriate the claim settlement to apply on the note. Instead, at the joint request of Manzo, Reynolds and McCracken, the bank released the insurance proceeds, excepting only the amount necessary to bring the loan payments to a current status. This action was taken on the representation that RBM would not otherwise continue as a going concern. The money thereby made available was used by RBM to pay unsecured creditors and, presumably, to restore a credit-worthy standing.

Bridgeman was not informed of the proposed use made of the insurance settlement and he did not join in the request by the other stockholders for the bank to release the funds. Bridgeman contended below, and asserts again here, that the bank breached its duty to him, as one liable on the note, to use the proceeds realized from collateral to reduce the debt or, if some other disposition was to be made, to secure his consent before the funds were released and his exposure was thereby increased.

The next event was in May, 1984 when, as noted above, James Reynolds withdrew from regular participation in the affairs of RBM. Because Reynolds was leaving the area and moving to Oklahoma, all of the stockholders, including Manzo and Bridgeman, requested the bank to release Reynolds from his personal obligation and also release the deed of trust on the Reynolds home. The bank acquiesced. It is contended that this was imprudent on the part of the bank and that some payment on the note should have been required by Reynolds in return for the release.

The last event contended to have amounted to a breach of the bank's duty was in January, 1985 when Manzo and McCracken approached the bank with a request that RBM be granted some temporary relief on note installment payments. It was represented that RBM could not meet the full payment schedule at that time, but that improvement would be in prospect if the payment schedule could be

reduced for six months. As a result of these negotiations, it was agreed that RBM note installment payments would be modified for the term February to August, 1985. A modification agreement to this effect was prepared. McCracken thereafter brought the modification agreement to the bank with the purported signatures of Bridgeman and Reynolds. Appellant Betty J. Blaco, an employee of the bank and a notary public, acknowledged the signatures to the agreement.

Bridgeman disclaimed any knowledge of the modification agreement. The evidence supports a finding that Manzo and McCracken acted to conceal the transaction from Bridgeman and that the signature to the modification agreement was not Bridgeman's. The basis for Bridgeman's claim against the bank by reason of this transaction, and against the notary, Blaco, is the acceptance of the forged document and the unlawful acknowledgement, all of which are asserted to have prejudiced Bridgeman by permitting RBM to make partial note payments between February and August, 1985.

The judgment entered after a bench trial generally found in favor of Bridgeman but against the Manzos. Bridgeman was awarded $43,646.88 damages against the bank, the attributed consequence of release of the fire insurance claim proceeds, $4,800 damages against the bank and Betty Blaco, associated with the forged modification agreement, and $50,000 punitive damages against the bank for instigating the false notarial acknowledgement. The Manzos were denied injunctive relief on their petition to stay foreclosure. On its counterclaim, the bank was given judgment against the Manzos for the balance due on the RBM note, $93,837.14,[1] accrued interest of $7,849.10, per diem interest of $24.42 from March 4, 1987 and attorney fees of $5,600.

## THE BANK'S APPEAL

Metro North Bank appeals both the award of judgment to Bridgeman in the amounts stated and the denial of its counterclaim against Bridgeman for his obligation on the RBM note. We first consider the issues associated with the release of the fire insurance claim proceeds. In this and in related topics, we assume the facts to have been found in accordance with the result reached by the trial court. This includes a finding that Bridgeman was unaware the insurance money had been utilized to pay unsecured creditors of RBM and for this reason, was denied an opportunity to protest to the bank.

■ Bridgeman's claim against the bank is based on the well recognized proposition that a creditor who receives property in exchange for collateral pledged to secure the debt must apply that property to the debt. The applicable provision of the Uniform Commercial Code, § 400.3–606(1)(b), RSMo 1986, states:

[t]he holder [of an instrument] discharges any party to the instrument to the extent that without such party's consent the holder ... unjustifiably impairs any collateral for the instrument given by ... the party ... against whom he has a right of recourse.

In fact, the security agreement in this case contained a similar statement:

Any money or property received in exchange for collateral shall be applied to the indebtedness or thereafter held by secured party pursuant to the provisions of this agreement....

The UCC provision and the general obligation of a creditor in dealing with collateral or the proceeds from collateral are, of course, subject to a waiver by the debtor. Thus, Manzo, who was party to the request that the bank make available the funds for payment to unsecured creditors, waived by that request any future opportunity to complain of the bank's conduct in granting the request. Bridgeman, although not a party to the arrangement for release of the

---

1. The amount of judgment was apparently computed to be the principal balance of the RBM note less payments by RBM and less $26,907.21 recovered from the personal bankruptcy of James McCracken. There is no dispute here as to computation of this balance or the amounts of interest.

insurance funds, is nonetheless precluded from claiming exoneration because of a prior general consent contained in the security agreement he executed. That agreement provided:

Debtor authorizes secured party without notice or demand and without affecting the liability of debtor under this agreement or on the indebtedness to:

... exchange, enforce, waive and release collateral described in this agreement or any part thereof or any such other security....

Considering only the respective rights of the parties under the relevant documents, Bridgeman has no ground to assert liability against the bank for the release of the insurance settlement proceeds.

■ Even though the bank may have had authority to act in the matter of the insurance funds without notice to Bridgeman, the bank was yet obligated to act in good faith and with a reasonable degree of care in its dealings with the corporation and the collateral. *Commerce Bank v. Wright*, 645 S.W.2d 17, 22 (Mo.App.1982). That requirement of good faith is particularly applicable to guarantors, if in a position of secondary liability. Good faith as defined by the UCC, § 400.1–201(19), RSMo 1986, means honesty in fact in the conduct or transaction concerned.

Bridgeman argues that even if the bank had the authority under the general language of the security agreement to release the collateral, it was, notwithstanding, under a good faith obligation to inform him of a transaction which would affect liability. He cites *Citizens Bank v. Lair*, 687 S.W.2d 268, 272 (Mo.App.1985), as supporting this position.

Although *Lair* does contain language suggesting a good faith duty on the bank to give notice to a guarantor that collateral was being applied to another obligation, the case is otherwise distinguishable in that the agreement between the bank and the primary debtor created a new note. *Id.* at 271. The basis for the decision was the creation of a new obligation at an increased rate of interest with a new maturity date.

In that circumstance, a guarantor of the original debt is necessarily discharged.

The *Lair* opinion does go on to discuss the obligation of the bank to act in good faith with respect to collateral and concludes that the bank breached that duty when it released the collateral on the original note without notice to the guarantor. Cited as authority are a 1931 Arizona decision and a 1917 Missouri case. This portion of the opinion is dicta because unnecessary to disposition of the case and is also contrary to prevailing law in Missouri.

The guarantor in *Lair* had executed an agreement with the bank, similar to that signed by Bridgeman, in which he consented in advance to the release or surrender of collateral without notice and assumed liability on the note as a maker. In the condition of such a guaranty, where the party assumes primary liability for the debt, that liability is unaffected by any acts or omissions of the creditor in relation to the loan collateral. *Lemay Bank & Trust Co. v. Lawrence*, 710 S.W.2d 318, 323 (Mo. App.1986) (citing *Commerce Bank v. Wright*, 645 S.W.2d 17 (Mo.App.1982)). We decline to follow that portion of the *Lair* case which would tend to support Bridgeman's argument. Bridgeman was a primary obligor on the RBM debt and as such, he has no standing to complain that the bank did not look to other sources for payment.

■ The second and third events in the sequence described earlier, the release of Reynolds and the RBM note extension agreement, are also advanced by Bridgeman as a basis for award of judgment to him. These grounds could not support the judgment for $43,646.88 damages based on the release of the insurance settlement, but could serve to excuse Bridgeman from liability to pay the RBM note. The bank contends not only that it is not liable in damages to Bridgeman but that it should recover judgment against Bridgeman as a primary debtor on the note.

The contention centering on the release of Reynolds requires little discussion. In the first place, the security agreement gave the bank the unrestricted right to

give such a release. Moreover, if Bridgeman had any right to complain that a co-maker of the note was excused, he waived that right when he joined in the request to the bank to release Reynolds.

As to the note modification agreement which altered the terms of payment by RBM, the only basis for Bridgeman's complaint is the fact that he was not a party to the agreement. Again, the language of the security agreement entitled the bank to extend the payment date on the note without impairing its right to seek payment from those otherwise liable. The agreement, which Bridgeman signed, expressly authorized the bank, "without notice or demand and without affecting the liability of debtor ... to ... renew, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of, the indebtedness or any part thereof." It was immaterial to the bank's rights against Bridgeman that his fellow stockholders concealed the transaction from him.

The points on this phase of the appeal, the bank's claim of error in the award of damages to Bridgeman on account of the insurance claim transaction and the related claim that it was error for the trial court not to have awarded the bank judgment against Bridgeman on the note, are interrelated and interdependent and have been discussed as such. If the bank was entitled to release the insurance funds, as we conclude, it was not answerable to Bridgeman in damages. Similarly, if the release of those funds, and the other transactions involving Reynolds and the note modification agreement were authorized by the terms of the security agreement, as we conclude, Bridgeman is not excused from liability on the RBM note. It therefore

follows that the trial court erred when it entered judgment awarding Bridgeman $43,646.88 in damages and also erred in not granting the bank judgment against Bridgeman on the note.

We conclude the bank was entitled to enforce Bridgeman's personal guaranty of the RBM note and to look to the collateral Bridgeman had deposited to the extent of such collateral and for such balance of the RBM debt as otherwise remained unsatisfied.[2] The trial court therefore erred when it entered judgment amounting to $43,646.88. Instead, the judgment should have been for the bank and against Bridgeman on the unsatisfied RBM note balance.

■ The second point raised in the bank's appeal relates to the judgment entered against the bank and Betty Blaco on Bridgeman's claim for damages resulting from the improper notarization of Bridgeman's purported signature on the RBM loan modification agreement. That judgment awarded Bridgeman $4,800 in actual damages against the bank and Blaco and $50,000 in punitive damages against the bank only. The bank and Blaco contend the judgments were in error, first, because there was no proof Bridgeman suffered any actual damages attributable to the improper acknowledgement by Blaco and, second, because no evidence showed any wanton or willful conduct sufficient to support punitive damages.

The evidence is uncontroverted that Bridgeman did not sign the modification agreement. Who forged his signature was not disclosed by the evidence. The only evidence on the subject was that McCracken picked up the agreement at the bank, took it around for signatures and returned it to the bank. Manzo testified McCracken

---

2. The Bridgeman collateral consisted of two certificates of deposit, one for $15,000 and one for $25,000. By means unexplained in this record, Bridgeman was in possession of the $25,000 certificate. The bank notified Bridgeman it was setting off the certificates against the debt and Bridgeman brought the one certificate to the bank. By mistake of a teller, Bridgeman was given a cashier's check for the value of the certificate, but when the mistake was discovered, the bank stopped payment on the check. The bank was not entitled to do so. Payment may not be withheld on a cashier's check because it is an unconditional promise by the bank to pay from its own funds. *State ex rel. Chan Siew Lai v. Powell,* 536 S.W.2d 14, 16 (Mo. banc 1976). In this case, Bridgeman endorsed the check and gave it to his attorney who deposited it in his client trust account. The issue is moot between Bridgeman and the bank because the latter would be entitled to an offsetting counterclaim if Bridgeman brought suit on the check.

brought it to him to sign. McCracken testified he might have mailed it to Oklahoma for Reynolds to sign, he really could not remember very much about it. McCracken denied signing Bridgeman's name on the agreement.

The trial judge found that Bridgeman had suffered damages by reason of the improper notarization of his signature in an amount equal to the difference between the note payments RBM was obligated to make between February and August, 1985, under the original terms of the note and the lesser installments permitted by the modification. The theory of this computation was that the RBM debt to the bank would have been reduced by the greater payment amounts, but for the modification agreement, and that Bridgeman's liability was proportionately increased in consequence of the agreement to which he was actually not a party.

The basis for the trial court's computation was an assumption that RBM would have paid the full amount of the note installments if the extension agreement had not been made. There was no evidence to this effect. Instead, the evidence was that RBM did not have the funds to make the payments and the extension was requested for that reason. To prevail on his claim for damages, it was necessary for Bridgeman to prove that RBM had the money to make the note payments but, because of the extension agreement, those funds were thereby used for other purposes, indirectly affecting the amount of Bridgeman's liability. The proof was not made and Bridgeman made no submissible case for actual damages against the bank or Blaco.

■ With respect to the award of punitive damages, the bank contends the trial court erred as a matter of law because the proof and finding were that Blaco's act was negligent, not wanton or willful, and therefore insufficient to support an award of punitive damages.

A review of the evidence Bridgeman presented to support his claim for punitive damages failed to disclose any proof from which it could be found that Blaco or any other bank employee or officer had any knowledge Bridgeman had not signed the extension agreement. There was, in fact, no direct proof Blaco notarized the document on the instruction of any bank officer. If the bank was liable at all, it was only by the act of its employee, Blaco and, according to the verdict, Blaco's act was negligent, not willful or wanton.

■ To recover punitive damages, based on negligent conduct, it must be shown that the party claimed to be liable had reason to know there was a high degree of probability the action would result in injury. *Hoover's Dairy, Inc. v. Mid–America Dairymen, Inc.,* 700 S.W.2d 426, 436 (Mo. banc 1985). Failing such proof in this case, it was error to submit Bridgeman's claim for punitive damages.

## THE MANZOS' APPEAL

■ Manzos first contend the court was in error in entering judgment against them because the acts of the bank which operated to release Bridgeman, as the trial court found, impaired the collateral and guaranty by Bridgeman. On this account, they say a resource otherwise available to pay the debt was lost to the bank when the certificates of deposit Bridgeman pledged could no longer be applied as an offset to the note balance. On this line of argument, the Manzos claim that if Bridgeman was released by the bank's conduct, they were released also. Even were the point to have merit, resolution of the bank's appeal to restore Bridgeman's liability as a primary obligor on the note resolves the issue and renders the Manzos' contention moot. Moreover, the question of whether the bank could look to Bridgeman, or to the collateral he deposited, for payment is irrelevant to the claim by the bank against the Manzos. This follows because the Manzos were primarily liable on the debt and not entitled to defend on the ground the bank elected to proceed against them to the exclusion of any of the others who were also liable.[3] In addition, the guaranty and se-

3. This opinion does not consider nor do any pleadings in the case raise any issue as to contri-

curity agreements signed by the Manzos authorized the bank to release any collateral without notice to or consent by the debtor. Thus, even if the conduct by the bank had operated to impair the bank's right to collect from Bridgeman or to appropriate the collateral he had deposited, the result would not be a defense available to the Manzos.

■ In their second point, the Manzos claim the bank did not act in good faith when it released the fire insurance proceeds without informing the Manzos that the effect was to grant a preference to unsecured creditors of RBM. The argument seems to be that using the insurance proceeds to pay RBM general creditors, who had no claim against the Manzos personally, was not in the Manzos best interests because available funds to reduce the bank debt, for which the Manzos were liable, were proportionately reduced. The argument of good faith seeks to establish an affirmative duty on the bank to advise the Manzos of all possible consequences flowing from a release of the insurance funds as requested by RBM stockholders and to warn the Manzos that the funds would better be applied to the corporate debt. They cite no authority for this proposition.

The evidence entitled the trial court to find that Jim Manzo was fully aware of the consequences of a release of the insurance proceeds by the bank. RBM and the shareholders were represented by an attorney in negotiating a settlement of the insurance loss. The purpose in making payment to RBM creditors from the insurance funds was to permit RBM to continue as a going business and, as the shareholders hoped, to eventually make a profit. Jim Manzo was expressly reminded at the time that if the bank agreed to release the funds, the bank could foreclose on the deed of trust and the Manzo home could be lost if RBM defaulted on the note.

Jim Manzo was fully aware, by his own admission, that using the insurance proceeds for purposes other than payment of

the bank loan left the collateral represented by the encumbrance on his home exposed. In view of this, the present argument seeks to place an affirmative duty on the bank to protect Manzo from the consequences of his own improvident business decision. The bank obviously had no such obligation, particularly where Manzo himself was one of those who initiated the request and petitioned the bank for the accommodation. Moreover, as has previously been observed, the bank had an absolute right under the security agreement signed by the Manzos to make any compromise or settlement it deemed desirable or proper with reference to collateral or to waive or release collateral. Even without notice to the Manzos, the bank could have released all of the insurance proceeds to be applied to RBM debts without incurring any liability to the Manzos. The second point raised by the Manzos has no merit.

■ The final point raised in the Manzos' appeal is equally insubstantial as was the second. They assert that the deed of trust given to secure repayment of the RBM note was invalid because inadequate consideration was paid and the provision for the place of foreclosure sale conflicted with the location of the real estate. The allegation regarding consideration claims the Manzos as grantors received no consideration for executing the deed of trust in that the loan proceeds were paid to RBM. It is not essential to the validity of a mortgage that the mortgagor should have received consideration. It is sufficient that the mortgagee parted with the consideration. *Hawkins v. Mall, Inc.*, 444 S.W.2d 369, 385–86 (Mo.1969) (quoting 59 C.J.S. *Mortgages* § 88, p. 133 (1949)). Here, the bank loaned RBM $160,000 and the Manzos, as guarantors, furnished the deed of trust as security. It is immaterial that payment of the loan proceeds was made to RBM and not to the Manzos.

■ The contention regarding the place of the foreclosure sale relies on the language of the deed of trust which provided

bution among the guarantors. No evidence was presented indicating any agreement among the shareholders in this subject. The bank would

obviously not be bound by such an agreement and is entitled to collect the full debt from any of the guarantors.

for sales in Clay and Platte Counties. Because their property lies in Platte County, the Manzos say no sale under the language of the deed of trust could validly be held. Examination of the deed of trust shows that the two counties were listed because the deed of trust included property other than that of the Manzos, and other parties as grantors. Some of the property conveyed was in Clay County and some was in Platte County. Section 443.310, RSMo 1986, provides that sales of real estate under a deed of trust shall be made in the county where the land is situated. The Manzos' residence is in Platte County and a foreclosure sale under the deed of trust would properly be scheduled and published to be held in Platte County.

To conclude, we find the trial court erred in awarding judgment to Richard Bridgeman and in failing to give judgment to Metro North Bank against Bridgeman on the bank's counterclaim. The trial court also erred in giving judgment to Richard Bridgeman against Betty Blaco. The court was correct in denying relief to Jim and Shirley Manzo and in granting the bank judgment against them.

The judgment in favor of Metro North State Bank and against Jim and Shirley Manzo is affirmed. The judgment against Metro North State Bank and Betty J. Blaco in favor of Richard Bridgeman is reversed and the case is remanded with directions that the court enter judgment in favor of Metro North State Bank and against Jim Manzo, Shirley Manzo and Richard Bridgeman jointly and severally in the amounts of $93,837.14 principal, accrued interest of $7,849.10, per diem interest of $24.42 from March 4, 1987 and attorney fees of $5,600 and that the court further enter judgment in favor of Metro North State Bank on the petition of Jim and Shirley Manzo and in favor of Metro North State Bank on the first amended petition in intervention by Richard Bridgeman and for costs.

All concur.