**R. Allen MAY, Individually and as Personal Representative of the Estate of Mary May, Plaintiffs–Respondents,**

v.

**AOG HOLDING CORP. (formerly known as Union L.P. Gas Systems, Inc.), Defendant–Appellant.**

No. 16607.

Missouri Court of Appeals, Southern District, Division Two.

May 15, 1991.

Motion for Rehearing or to Transfer Denied June 20, 1991.

Application to Transfer Denied July 23, 1991.

Richard E. Dorr, Dorr, Baird and Lightner, R. Lynn Myers, Springfield, for defendant and appellant.

David W. Hall, Jr., Bussell, Hough, O'Neal & Hall, Craig R. Oliver, Miller & Sanford, Springfield, for plaintiffs and respondents.

FLANIGAN, Chief Judge.

Plaintiffs R. Allen May and his wife Mary May brought this action against defendant AOG Holding Corp., formerly known as Union L.P. Gas Systems, Inc., (Union Gas), for injuries sustained by R. Allen May arising out of an explosion which occurred on February 28, 1981, at Queen City Car Wash in Springfield. Mary May's claim was based on loss of her husband's consortium. The explosion occurred when a hose connected to a propane tank on a pickup truck became entangled in an overhead brush inside the car wash. Union Gas had "converted" the truck so that it could operate on propane gas. The truck was owned by James Wade. May was a customer of the car wash at the time of the explosion.

Prior to the trial, the trial court sustained plaintiffs' motion for summary judgment as to the liability of Union Gas, with respect to any actual damages sustained by each plaintiff, based on the collateral estoppel effect of a final judgment entered in an earlier lawsuit arising out of the same explosion.

The jury awarded Allen May $150,000 in actual damages and $100,000 in punitive damages, and awarded Mary May $15,000 in actual damages. Union Gas appeals.

Union Gas contends that the trial court erred in giving Instruction 11, plaintiff Allen May's instruction submitting punitive damages, because plaintiffs failed to make a submissible case on the issue of punitive damages "since there was insufficient evidence to show the required mental state of defendant's employee at the time of the acts shown in Instruction 11," and Instruction 11 failed to provide to the jury the objective standard that Union Gas's conduct must be "outrageous" because of Union Gas's evil motive or reckless indifference to the rights of others.

The challenged instruction reads:

"Instruction No. 11

If you believe the conduct of defendant Union Gas in filling the tank with liquid propane gas, releasing the tank to the customer, James Wade, and failing to install a solid steel plug in the tank showed complete indifference to or conscious disregard for the safety of others, then in addition to any damages to which you may find plaintiff entitled under Instruction Number 7 you may award plaintiff an additional amount as punitive damages in such sum as you believe will serve to punish defendant Union Gas and to deter defendant Union Gas and others from like conduct."

At the close of plaintiffs' evidence and at the close of all the evidence, Union Gas moved for a directed verdict on the issue of punitive damages. Those motions stated that as a matter of law plaintiffs' evidence failed to make a submissible case on the issue of punitive damages because "there is no evidence that any injury would naturally or probably result from any conduct on the part of Union Gas by and through its agents and employees and because there is no evidence that Union Gas or its agents or employees intended to perform an act with knowledge that the act was wrongful when performed." The same point was preserved in Union Gas's post-trial motions.

Plaintiff Mary May neither sought nor received an award of punitive damages, and Union Gas makes no challenge to that portion of the judgment awarding her actual damages. Union Gas does not challenge the award of actual damages to Allen May.

■ The issue is whether Allen May made a submissible case for punitive damages. In determining whether he did so, this court must review the evidence in the light most favorable to plaintiff and give him the benefit of all inferences which may reasonably be drawn from the evidence. *Bhagvandoss v. Beiersdorf, Inc.*, 723 S.W.2d 392, 397 (Mo. banc 1987); *Smith v. Allied Supermarkets, Inc.*, 524 S.W.2d 848, 849[1] (Mo. banc 1975). No fact essential to submissibility may be inferred in the absence of a substantial evidentiary basis. *Minnesota Mining & Mfg. Co. v. Williamson*, 675 S.W.2d 951, 953[3] (Mo.App.1984). In determining the issue presented, this court considers only the conduct submitted to the jury by Instruction 11, upon which the verdict for punitive damages was returned. *Thaller v. Skinner & Kennedy Co.*, 315 S.W.2d 124, 126[1] (Mo. banc 1958); *Guthrie v. City of St. Charles*, 347 Mo. 1175, 152 S.W.2d 91, 95[5] (banc 1941); *Grissom v. Handley*, 410 S.W.2d 681, 685[2] (Mo.App.1966).

The test for this court to apply in determining whether the evidence is sufficient to submit the issue of punitive damages is whether a reasonable juror could have found that the conduct of Union Gas submitted in Instruction 11—filling the tank with liquid propane gas, releasing the tank to the customer James Wade, and failing to install a solid steel plug in the tank—meets the requirements of Missouri law for imposing punitive damages based on negligent conduct. See *Smith v. Courter*, 575 S.W.2d 199, 207[6, 7] (Mo.App.1978). Those requirements, under the circumstances here, are found in MAI 10.02 [1983 Revision], Note 3 of the Notes on Use [1991 Revision] under MAI 10.02 and MAI 10.07 [1991 New]. Note 3 under MAI 10.02 states that MAI 10.02 is not adequate to submit punitive damages where, as here, the verdict-directing instruction does not contain a submission on the issue of defendant's "knowledge."

Except for offering portions of Allen May's deposition as admissions on matters not material here, Union Gas presented no witnesses. All of the testimony pertinent to the issues on this appeal came from plaintiffs' witnesses, some of whom were employees of Union Gas. "Without question, a party is bound by the uncontradicted testimony of his adversaries which he introduces." *Klotsch v. P.F. Collier & Son Corporation*, 159 S.W.2d 589, 594[7] (Mo. banc 1942). See also *Taylor v. Riddle*, 384 S.W.2d 569, 573–574[3, 4] (Mo.1964); *Hoock v. S.S. Kresge Co.*, 230 S.W.2d 758, 760–761[4] (Mo. banc 1950); *Frazier v. Stone*, 515 S.W.2d 766, 769[13] (Mo.App.1974). "[S]ince plaintiff has the burden of proof if he puts on only one witness to prove a fact and his positive statement on direct testimony is that the fact is definitely one way, then the plaintiff cannot have the jury disregard his only direct evidence on the point and find that the fact is exactly the opposite on the basis of inferences from circumstances also stated in the testimony of this same witness." *Draper v. Louisville RR. Co.*, 156 S.W.2d 626, 634[12] (Mo.1941).

James Wade testified that he operated Wade Cleaners and Laundry, and West Side Laundry, in Mountain Grove. At the cleaning establishment he had two 500–gallon propane tanks, and at the laundry he had a 1000–gallon propane tank. Wade owned a 1976 pickup truck. In 1979 he bought a used propane tank because he intended to have the truck "converted" so that it could operate on propane gas as well as gasoline. The tank was equipped with a hose attached to a globe valve.

Wade was a propane customer of Union Gas, and had been for several years. Shortly after Wade purchased the tank, Glen Boykin, manager of Union Gas's propane facility at Norwood, helped Wade load the tank onto Wade's pickup. Wade told Boykin that Wade was interested in using the hose to transfer propane from his laundry tanks to fill the tank on the pickup after it had been converted.

In February 1981, Wade talked with Boykin about having the truck converted and Boykin, acting for Union Gas, agreed to convert the engine to propane gas for $400.

On February 15 or 16, 1981, Wade's wife delivered the truck, tank, globe valve and hose to Boykin at the Union Gas facility in Norwood. The tank was in the bed of the pickup, just behind the cab. The hose and globe valve were not attached to the tank at that time. One of the openings on the tank was the "liquid withdrawal opening," and at the time Boykin received the truck a pipe nipple was in that opening. When Boykin helped Wade load the tank onto Wade's pickup shortly after Wade purchased the tank, the pipe nipple was in the opening and the hose and globe valve were attached to the nipple.

Boykin commenced the conversion on February 18. After the work on the engine had been completed, Boykin attached the globe valve (with hose attached) to the pipe nipple in the liquid withdrawal opening on the tank. He did that to plug the opening so propane could be put in the tank. George Stigall, another employee of Union Gas, put propane in the tank. Before attaching the globe valve to the liquid withdrawal opening, Boykin looked at the opening and saw there were no safety valves in it. A solid steel plug would have fit the opening, but Boykin did not have such a plug in stock.

On February 19, 1981, the conversion was completed by Boykin. Wade picked up the truck at the Union Gas facility while Boykin was out on a service call. A few minutes after Wade picked up the truck, he met Boykin on a road in the vicinity, and the two men had a conversation. There was some dispute between Wade and Boykin concerning the contents of that conversation.

According to Wade, he told Boykin that "it looked like it was a good installation." Boykin said that he needed to come down and replace a couple of valves, that they needed to be replaced later. Wade said, "Fine, any time you want to just come down and do it." Wade also said that when Boykin made those remarks, "I reached over the bed just to, and smelled to see if there was any leak or anything since

he mentioned that the valve needed to be replaced. I said, 'Well, it's not leaking gas any place. I guess it's all right,' and Boykin said, 'It's fine.' Then I went on home."

According to Wade, Boykin did not say which valve or valves needed to be replaced. Wade also said, "My thinking was, knowing a few things about steam valves, water valves, that when they are old possibly they would need to be changed later on, but Boykin did not indicate there was anything seriously wrong with them. I said to Boykin, 'Why didn't you replace the valves now,' and Boykin said he didn't have them. I said, 'Why didn't you go over to the hardware store and purchase a valve if it was necessary,' and Boykin said, 'I did but they didn't have the valve over there to replace it,' so I assumed, and I had no reason to question him, that it would be safe until he found a valve or ordered a valve and came to Mountain Grove and replaced it."

Asked whether Boykin said anything to him that led him to believe the tank was unsafe, Wade testified that Boykin said that since the tank was not bolted down, to be careful and take it easy going back to Mountain Grove. "I told him I would do that." Wade testified that he drove the truck to Mountain Grove and had the tank bolted down the next day.

Boykin testified that, prior to the conversation, he had test driven the truck. Referring to the conversation, Boykin testified: "I told Wade the pickup was running good. I also told him to get his tank bolted down and told him at that time that he needed to get the gas out of the tank and get the hose off and plug the opening. Wade mentioned something about using the hose to fill the tank. We agreed to fill this tank whenever we filled his laundry tanks. That's when I told Wade to be sure and get the gas out of the tank and get this hose off and get the opening plugged. I remember telling Wade, when he mentioned the hose, that he might use the hose to fill his tank up from his laundry tank. I remember telling him we would have to check to see if he had the right valves to do that. I talked about whether he had the correct

valves to make transfers from the laundry tank to this tank."

Boykin also testified: "I knew the tank was dangerous because it needed to have a plug in it. What I was concerned about was the tank not being bolted down and maybe rolling over. I knew the hose needed to come off and it be plugged. I knew it was potentially dangerous if it was misused. I knew it was dangerous because it wasn't bolted down. I told Wade it needed to be bolted down. After the conversation I had with Wade in the road, I did not talk with him before the explosion. I made an attempt to, but I didn't catch him. On February 26, I went to the Wade Laundry to talk to Wade about propane prices and to see what Wade was going to do with this hose for sure, if he was going to get it off and to see if he had his tank bolted down. I was concerned about that hose being on there, and I wanted to see that he got it off because I told him to get it off. Wade was not there. The tank had been bolted down by that time and I talked to Mrs. Wade. I did not discuss the tank at all."

Boykin testified that when he talked to Wade in the road, Boykin's main concern was about the tank not being bolted down and it might turn over and break a valve and break the hose. "I knew it needed to have a plug in it and I was concerned about the opening being dangerous, not just that it needed to be bolted down." Boykin testified that he had some concern about the hose being on there. He also testified that propane gas is extremely dangerous unless adequate precautions are taken to ensure that it is handled safely.

On February 28, 1981, Wade drove the truck to the Queen City Car Wash in Springfield. The hose and globe valve were still attached to the liquid withdrawal opening as Boykin had placed them. A car wash employee drove Wade's truck onto the automated track. Wade testified that there were two young employees at the car wash, who were "attendants," and he asked them to take the antenna off the top of the truck and one of them did. Wade also said: "A couple of times before, they had ruined my antenna and I wanted to be

sure that the equipment in the back of my pickup would be safe to go through the car wash."

Allen May's car was immediately behind Wade's pickup. May walked through the hallway next to the track on which the vehicles were traveling through the car wash. Shortly thereafter, the explosion occurred and May was thrown 20 feet outside the car wash building, the walls of which were "leveled" by the blast.

The hose on the tank in the bed of the pickup had become entangled with the overhead brush of the car wash. The globe valve, which was attached to the hose, had been pulled away from the tank and a rupture had occurred in the pipe nipple in the liquid withdrawal opening. The explosion resulted.

Instruction 7, referred to in Instruction 11, has not been challenged on this appeal. Instruction 7, given at the request of Allen May, dealt with actual damages. Instruction 7 told the jury "under the law, defendant Union Gas is liable to plaintiff Allen May for damages in this case."

The conduct of Union Gas, submitted in Instruction 11, had been submitted to the jury in a prior action against Union Gas arising out of the car wash explosion. In the prior action, the appeal of which is found in *Sunshine Realty Corp. v. Killian*, 702 S.W.2d 95 (Mo.App.1985), that conduct was submitted on the theory of negligence. In their brief as respondents here, plaintiffs argue that "Missouri law clearly allows the award of punitive damages when the underlying claim is negligence." Seeking to uphold the giving of Instruction

11, plaintiffs cite MAI 10.02 and *Sharp v. Robberson*, 495 S.W.2d 394 (Mo. banc 1973). In fairness to able counsel on both sides, who have provided this court with excellent briefs, it must be pointed out that some of the Missouri cases dealing with punitive damages based on negligent misconduct were decided after the instant trial.

In *Stojkovic v. Weller*, 802 S.W.2d 152 (Mo. banc 1991); *Menaugh v. Resler Optometry, Inc.*, 799 S.W.2d 71 (Mo. banc 1990); *Hoover's Dairy, Inc. v. Mid–America Dairymen, Inc.*, 700 S.W.2d 426 (Mo. banc 1985); *Nichols v. Bresnahan*, 212 S.W.2d 570 (Mo.1948); and *Reel v. Consolidated Inv. Co.*, 236 S.W. 43 (Mo.1921), our Supreme Court enunciated principles pertaining to the right of a plaintiff to recover punitive damages in a negligence action.[1]

Punitive damages may be awarded in a negligence action if the defendant "showed complete indifference to or conscious disregard for the safety of others," *Stojkovic v. Weller*, 802 S.W.2d at 155; *Menaugh v. Resler Optometry, Inc.*, 799 S.W.2d at 73, *and* if the defendant "knew or had reason to know that there was a high degree of probability that the action would result in injury." *Stojkovic*, at 155; *Hoover's Dairy, Inc. v. Mid–America Dairymen, Inc.*, 700 S.W.2d at 436.

"Though the fact situations differ, the uniform tenor of the recent cases is that punitive damages are to be the exception rather than the rule, and that they are to be confined to cases in which the evidence supports the award. The phraseol-

---

1. In *Burnett v. Griffith*, 769 S.W.2d 780 (Mo. banc 1989), the court discussed standards which permit a submission of punitive damages to the jury in an assault and battery case. At p. 789 the court revised MAI 10.01, dealing with punitive damages in a situation involving intentional misconduct. One of the findings required by the revised instruction is: "The conduct of defendant as submitted in Instruction Number _____ (here insert number of plaintiff's verdict directing instruction) was outrageous because of defendant's evil motive or reckless indifference to the rights of others."

The court said, at 789:

"Lest there be any confusion, in adopting the new instruction we do not overrule cases

which have held that punitive damages require a wilful, wanton or malicious culpable mental state. The definitional concepts of those terms are included in the new MAI 10.01. Moreover, we do not intend to invent any new concept as to punitive damages by including the word 'outrageous' in the new instruction. An attentive observer would note that this Court cited with approval the Restatement comment that 'there must be "some element of outrage to justify punitive damages." ' *Bhagvandoss v. Beiersdorf, Inc.*, 723 S.W.2d 392, 397 (Mo. banc 1987) quoting Restatement (Second) of Torts, § 908(1) Comment b (1979)."

ogy differs in different kinds of cases, but all depend on willful wrongdoing, or recklessness which is the legal equivalent of willfulness."

*Menaugh,* 799 S.W.2d at 75.

 A claim for punitive damages is not inconsistent with a claim for negligence, so long as the evidence contains factual support for an award of punitive damages and the jury is properly instructed.[2] A punitive damage award is not appropriate in every negligence case. "Facts in addition to those relied on in the negligence submission must be established in order to recover punitive damages." Punitive damage submissions do not require "clear and convincing" evidence. *Id.* at 74–75.

 Scienter in some degree is essential to the award of punitive damages in a negligence case. *Menaugh,* at 74; *Hoover's Dairy,* at 435. Ordinarily punitive damages are not recoverable in an action for negligence because negligence, an omission of the duty to exercise care, is the antithesis of willful or intentional conduct. An act or omission, though properly characterized as negligent, may manifest such reckless indifference to the rights of others that the law will imply that an injury resulting from it was intentionally inflicted. *Hoover's Dairy,* at 435.

*"[T]here may be conscious negligence tantamount to intentional wrongdoing, as where the person doing the act or failing to act must be conscious of his conduct, and, though having no specific intent to injure, must be conscious, from his knowledge of surrounding circumstances and existing conditions, that his conduct will naturally or probably result in injury...."* (Emphasis in original.)

*Id.* at 435.

Citing *Reel v. Consolidated Inv. Co.,* 236 S.W. 43 (Mo.1921); *Sharp v. Robberson,* 495 S.W.2d 394 (Mo. banc 1973); and Restatement (Second) of Torts, § 500, the court said, in *Hoover's Dairy,* at 435–436:

"[T]he actor must either know or have reason to know that his or her act is substantially likely to cause physical harm. Perhaps the classic example is of an individual firing a rifle into a moving passenger train. There, the actor either knows or has reason to know that there is an unreasonable risk that a passenger will be hit."

The court also said:

"Poor workmanship that does not pose an *immediate* danger to the safety of others does not justify awarding punitive damages....

[A]nalogy can be drawn to a mechanic who fails to test the brakes on a car. Assuming that the examination should have been conducted, the mechanic is negligent but not liable for punitive dam-

---

**2.** It might be argued that if a finding of outrageousness is necessary where the defendant's conduct is intentional, a fortiori, it should be required where his conduct is negligent, although of a high degree of negligence. Neither MAI 10.02 [1978 Revision] nor MAI 10.07 [1991 New], dealing with exemplary damages based on negligence, requires a finding of outrageousness.

MAI 10.07 [1991 New] reads:
"10.07 [1991 New] Damages—Exemplary—Modification of MAI 10.02—Submission of Specific Acts and Knowledge
(Approved, March 26, 1991; Effective, July 1, 1991)
 If you find in favor of plaintiff under Instruction Number _____ (*here insert number of plaintiff's verdict directing instruction based on negligence*), and if you believe that
 First, (*here describe the act or omission that justifies the submission of punitive damages*), and

Second, defendant knew or had information from which defendant, in the exercise of ordinary care, should have known that such conduct created a high degree of probability of injury, and
 Third, defendant thereby showed complete indifference to or conscious disregard for the safety of others,
then in addition to any damages to which you find plaintiff entitled under Instruction Number _____ (*here insert number of plaintiff's damage instruction*), you may award plaintiff an additional amount as punitive damages in such sum as you believe will serve to punish defendant and to deter defendant and others from like conduct."
Note that MAI 10.07 does not expressly require a finding that the conduct described in paragraph First in fact caused plaintiff's injury. This court expresses no opinion on that matter.

ages unless it can be shown that he or she knew or had reason to know that the brakes were faulty and thus a substantial likelihood existed that the brakes would fail and result in great bodily harm. Such is the critical difference between negligence in order to establish liability and reckless conduct which would justify a punitive damage award." (Emphasis in original.)

*Id.* at 436.

In varying factual situations, Missouri courts have determined, in an action based on negligence, whether the evidence was sufficient to submit the issue of punitive damages. The evidence was held sufficient in *Stojkovic v. Weller,* supra, (defendant drove while drunk into busy intersection and, after striking plaintiff, left scene at high speed and struck another vehicle); *Menaugh v. Resler Optometry, Inc.,* supra, (corporate defendant permitted unlicensed employee to give improper professional (optometric) advice to plaintiff as to lens care); *Sharp v. Robberson,* supra, (wall of defendant's building collapsed upon adjoining public parking lot, injuring plaintiff); *Reel v. Consolidated Inv. Co.,* supra, (defendant's elevator fell, injuring plaintiff—cable was defective and defendant, with knowledge of defect, made no attempt to repair for a period of six weeks); *Arana v. Koerner,* 735 S.W.2d 729 (Mo. App.1987) (legal malpractice action against defendants-attorneys for inadequate investigation and negligent settlement of medical malpractice claim of plaintiff-client); *Smith v. Courter,* 575 S.W.2d 199 (Mo. App.1978) (medical malpractice action against physicians—defendant did not look at x-rays or failed to see lesion, causing plaintiff two unnecessary operations); *Mason v. Kurn,* 145 S.W.2d 465 (Mo.App.1940) (defendant railroad, with knowledge of condition of unusually dangerous crossing, failed to warn plaintiff and failed to remedy condition until four months after plaintiff was injured).

The evidence was held insufficient in *Hoover's Dairy, Inc. v. Mid–America Dairymen, Inc.,* supra, (defendant installed milking system without testing for stray voltage); *Evans v. Illinois Cent. R. Co.,* 289 Mo. 493, 233 S.W. 397 (Mo. banc 1921) (wrongful death action—defendant's train moved at high speed and without warning toward and over busy public street); *Leahy v. Davis,* 121 Mo. 227, 25 S.W. 941 (1894) (defendant-owner did not lock or fasten door of elevator shaft into which decedent fell); [3] *Parker v. Midwestern Distribution, Inc.,* 797 S.W.2d 721 (Mo.App.1990) (plaintiff's vehicle broke down on narrow bridge —defendant's truck attempted to pass while plaintiff checking repairs); *Manzo v. Metro North State Bank,* 759 S.W.2d 77 (Mo.App.1988) (improper notarization by defendant of plaintiff's purported signature on loan agreement); *Jordan v. General Growth Dev. Corp.,* 675 S.W.2d 901 (Mo. App.1984) (plaintiff sued defendant contractor for slipping on slick spot on floor caused by leak in roof); *Sledge v. Town & Country Tire Centers, Inc.,* 654 S.W.2d 176 (Mo.App.1983) (rear axle of vehicle broke causing injury to plaintiff passenger, due to failure of defendant-repair company to lubricate bearings); *Stenson v. Laclede Gas Co.,* 553 S.W.2d 309 (Mo.App.1977) (plaintiff passenger in vehicle which struck hole in paved street resulting from subsidence of fill in defendant's excavation); *Gerran v. Minor,* 192 S.W.2d 57 (Mo.App. 1946) (plaintiff-pedestrian struck by vehicle driven by defendant).

The tank, hose and globe valve were provided Union Gas by Wade. Although the evidence is sufficient to support a finding of negligence on the part of Union Gas in failing to install a solid steel plug in the tank, Boykin intended to remedy that situation. Although Boykin and Wade disagreed with regard to the contents of their conversation on February 19, Wade admitted that Boykin told him that a couple of valves needed to be replaced and that Boykin would come later and replace them.

---

**3.** "There is no recovery in a death case for punitive damages as such. Such a petition may plead, and appropriate instructions may submit, the question of 'mitigating or aggravating circumstances' if the evidence justifies it." *Glick v. Ballentine Produce, Inc.,* 396 S.W.2d 609, 616 (Mo.1965).

On February 26, Boykin went to Wade's laundry because he was concerned about the hose being on there. The explosion occurred nine days after the conversation in the road and two days after Boykin's trip to the laundry. The circumstances surrounding the rupture of the hose from the tank were unusual, although perhaps not totally unpredictable. Wade admitted that on prior occasions at the car wash he had removed antennas from his vehicle to avoid contact with the overhead brush.

This court concludes that a reasonable juror could not properly find that the conduct of Union Gas created a high degree of probability of injury or constituted complete indifference or conscious disregard for the safety of others. The conduct of Union Gas set forth in Instruction 11 was not outrageous, nor did it call for punishment. That conduct did not pose an immediate threat to the safety of others. This court holds that the evidence was insufficient to support an award of punitive damages and the trial court erred in submitting that issue to the jury.

It is unnecessary to consider whether Instruction 11 was defective in form as claimed by Union Gas or to consider other points raised by Union Gas.

The portion of the judgment which awards plaintiff R. Allen May $100,000 punitive damages is reversed. In all other respects, the judgment is affirmed. It is so ordered.

HOGAN, J., concurs.

PARRISH, P.J., files opinion concurring in part and dissenting in part.

PARRISH, Presiding Judge, concurring in part and dissenting in part.

I concur in the part of the majority opinion that affirms the judgment for actual damages. I dissent from the part of the opinion that reverses the judgment for punitive damages.

I have no disagreement with the majority opinion's pronouncement of the applicable Missouri law regarding punitive damages in cases in which the underlying claim is negligence. I do not agree, however, that the facts of this case are such that a reasonable juror could not find that the conduct of AOG Holding Corporation (Union Gas) amounted to a conscious disregard for the safety of others. Nor do I agree with the assessment that the conduct of Union Gas did not pose an immediate threat to the safety of others. My difference of opinion is founded upon the intended use for which the tank was installed in James Wade's pickup truck. The tank was to be used to store propane gas—a highly volatile substance—for use as fuel in the truck's engine. Because of the dangerous propensities of propane gas—propensities recognized by Glen Boykin, manager of Union Gas's propane facility [1]—I believe that a reasonable juror could have found that installing and filling the propane tank without having in place a solid steel plug amounted to a conscious disregard for the safety of others.

In my opinion, the extent of danger posed by the nature of propane gas should be considered. Because of its volatile nature, a leakage of a substantial volume of propane gas is hazardous. Unlike a tank used for transporting or dispensing water or other similarly innocuous substances, a tank used to store and dispense propane gas must be installed and maintained with scrupulous care to avoid threat of serious injury. No one should be more aware of such requirements than a company such as Union Gas—and its employees—that works with propane gas in the ordinary course of its day-to-day activities. I believe a reasonable juror could consider conduct to be outrageous when a propane tank was installed in a pickup truck and filled without the tank's outlets being properly plugged. A reasonable juror might consider such complacency on the part of Union Gas (through its employees) to be a conscious disregard for the safety of others.

---

**1.** As stated in the principal opinion, Mr. Boykin testified, "I knew the tank was dangerous be- cause it needed to have a plug in it."

In my opinion, the failure to install a proper solid steel plug in a propane tank to be used as a fuel tank in a motor vehicle could be considered to be improper installation of the tank, not mere faulty workmanship. Faulty workmanship would occur if a proper plug was inserted in the tank in an improper manner—not from the failure to use a proper plug in the tank. In my opinion, the former is faulty workmanship; the latter, improper installation. I believe that a reasonable juror could conclude that, by using the nipple and hose in lieu of the required solid steel plug, Union Gas's employees knowingly installed the tank in an improper manner and that such conduct constituted a conscious disregard for the safety of others.

I further disagree with the conclusion that the acts of Union Gas did not pose an immediate threat to the safety of others. The propane tank that Union Gas installed and filled was installed in a motor vehicle, a mobile object that is bounced about and traversed through innumerable locales and conditions. The threat of dislodging the hose and nipple that were used instead of a solid steel plug was present at all times from and after the installation and filling of the propane tank. In my opinion the fact that the hose and nipple were not immediately torn from the propane tank does not lessen the immediateness of its danger.

This case involved a tank that would hold a potentially destructive substance—propane gas—a substance that posed grave danger if permitted to escape into the atmosphere in the vicinity of a spark or other source of ignition. This is factually different from a leaky roof that permits a puddle of rainwater to accumulate as in *Jordan v. General Growth Dev. Corp.*, 675 S.W.2d 901 (Mo.App.1984). It is different from stray voltage that produces nervous cows when the voltage enters newly installed milking machines as in *Hoover's Dairy, Inc. v. Mid–America Dairymen, Inc.*, 700 S.W.2d 426 (Mo. banc 1985). It is different from an automobile maintenance shop's failure to lubricate bearings so as to cause an axle to break as in *Sledge v. Town &*

*Country Tire Centers, Inc.*, 654 S.W.2d 176 (Mo.App.1983).

The issue of punitive damages was submitted to the jury. The jury found for plaintiff R. Allen May on that issue. I perceive no error. I would affirm the judgment in all respects, including the award of punitive damages.