Russell E. SCHROEDER and Edgar Schroeder, Plaintiffs–Respondents.

v.

LESTER E. COX MEDICAL CENTER, INC., Defendant–Appellant.

No. 17147.

Missouri Court of Appeals, Southern District, Division Two.

May 27, 1992.

**412**

Thomas Strong, Jeffrey W. Bates, Strong & Associates, P.C., Springfield, for defendant-appellant.

James W. Newberry, Randy R. Cowherd, Springfield, for plaintiffs-respondents.

FLANIGAN, Chief Judge.

On November 19, 1991, this court issued an opinion in this cause. On January 31, 1992, by order of the Supreme Court of Missouri, this cause was transferred to that court. On May 22, 1992, the Supreme Court entered an order retransferring the cause to this court. The original opinion of this court, which follows, is now readopted and reissued.

This is an action for the wrongful death of Irene Schroeder, who died on May 17, 1988, while undergoing coronary bypass surgery in the operating room of defendant Lester E. Cox Medical Center, Inc. ["Cox"]. Plaintiff Russell Schroeder is the surviving husband of the decedent, and plaintiff Edgar Schroeder is her son.

The case was tried in two stages. At the end of the first stage, the jury returned a verdict in favor of the plaintiffs and assessed "total damages" at $92,453.34. At the end of the second stage, the jury returned a verdict assessing plaintiffs' damages "for aggravating circumstances" at $400,000. Cox appeals.

Cox's brief states: "Cox is not appealing from the actual damage award against it. The issues presented in this appeal relate solely to the propriety of the noncompensatory damage award against Cox."

During the operation, decedent's heart was stopped by the surgeon, Mark Avery, M.D., to permit arterial grafting. A cardioplegic solution was administered to the patient to protect the heart from damage while stopped.

The cardioplegic solution was prepared in Cox's pharmacy by Glenda Adams, a pharmacist employed by Cox. In preparing the solution, Glenda used a machine called a compounder, which was manufactured by Baxter–Travenol, a non-party. A compounder is a type of pump used to measure and mix fluids. There was evidence that the compounder malfunctioned while Glenda was preparing the solution, although she was not aware of the malfunction.

After Dr. Avery completed the bypass, he attempted to restart decedent's heart but was unable to do so. At Dr. Avery's request, the cardioplegic solution was tested immediately. The laboratory results showed that the solution did not contain the proper amount of dextrose. That deficiency caused decedent's death.

In general, Cox makes these contentions:

1. The trial court erred in denying Cox's motion for a directed verdict at the close of all the evidence, and in denying Cox's post-trial motion for judgment notwithstanding the verdict, on the issue of "punitive damages or aggravating circumstances damages," because the evidence was insufficient to support an award for such damages.

2. Even if the plaintiffs made a submissible case with respect to the issue of punitive damages or aggravating circumstances damages, Instructions 7, 9, 10, 12 and 14, and the verdict form submitted at the end of stage 2, were erroneous. The verdict form was used for the $400,000 award.

3. The trial court erred in receiving into evidence, over Cox's objection, plaintiffs' Exhibit 38, which showed Cox's "net worth" and "net income" for 1987, 1988, and 1989.

Instructions 7, 9 and 10 were given at the close of the evidence in stage 1 of the trial. These instructions, submitted by plaintiffs, read:

## INSTRUCTION NO. 7

Your verdict must be for plaintiffs if you believe:

First, defendant failed to require its pharmacy employees to observe compounding of the cardioplegic solution, and

Second, defendant was thereby negligent, and

Third, as a direct result of such negligence Irene Schroeder died.

## INSTRUCTION NO. 9

If you find the issues in favor plaintiffs, and if you believe the conduct of defendant as submitted in Instruction Number 7 was outrageous because of defendant's reckless indifference to the rights of others, you should find in favor of plaintiffs on their claim for aggravating circumstances on the verdict form.

## INSTRUCTION NO. 10

If you find in favor of plaintiffs, then you must award plaintiffs such sum as you believe will fairly and justly compensate plaintiffs for any damages you believe they sustained and are reasonably certain to sustain in the future as a direct result of the fatal injury to Irene Schroeder.

Any damages you award must be itemized by the categories set forth in the verdict form.

You must not consider grief or bereavement suffered by reason of the death.

In determining the total amount of plaintiffs' damages, you must not increase such damages for the purpose of awarding plaintiffs damages for aggravating circumstances. If you find in favor of plaintiffs on that claim on the verdict form, there will be a second stage of trial to determine the additional amount, if any, plaintiffs will be awarded as damages for aggravating circumstances.[1]

After the jury returned the verdict of $92,453.34, stage 2 commenced. The only evidence introduced by plaintiffs was Exhibit 38. After Cox had introduced evidence, the court gave additional instruc-

---

1. The verdict form which was used by the jury in making the award of $92,453.34 has not been challenged by Cox on this appeal. On that form, the jury did the following:
   1. Found in favor of the plaintiffs and against Cox on plaintiffs' claim "for the death of Irene Schroeder."
   2. Found in favor of the plaintiffs and against Cox on plaintiffs' claim "for aggravating circumstances."
   3. Awarded "total damages" of $92,453.34. That sum was the total of four figures representing, respectively, the amount assessed for past economic damages, past non-economic damages, future economic damages, and future non-economic damages.
   Immediately below the line calling for the insertion of the award of total damages, here $92,453.34, the following language appears:
   "Note: Do not include any additional amount as damages for aggravating circumstances if you found in favor of plaintiffs on that claim."
   "Note: All jurors who agree to the above findings must sign below."
   Eleven jurors signed this verdict.

tions, including Instruction 12, Instruction 14, and the form of verdict for stage 2. They read:

## INSTRUCTION 12

This stage of the trial will proceed as follows:

First, further instructions in writing will be read to you by the court. After hearing those instructions, the attorneys may begin with opening statements; the introduction of evidence; and their closing arguments.

You will then be given the written instructions of the court to take with you to your jury room. You will go to that room, deliberate and arrive at your verdict setting the amount of damages for aggravating circumstances.

## INSTRUCTION 14

If you believe it is warranted by the aggravating circumstances you have found to exist, you may award plaintiffs an additional amount as damages for aggravating circumstances in such sum as you believe will serve to punish defendant and to deter it and others from like conduct.

## VERDICT

We, the undersigned jurors, assess the damages of plaintiffs for aggravating circumstances as follows: $——.

The jury inserted "$400,000" in the blank of the verdict form, and 11 jurors signed it.

■ Cox's first point is that the trial court erred in denying its motion for directed verdict at the close of all the evidence, and in denying its post-trial motion for judgment notwithstanding the verdict, on the issue of punitive damages or aggravating circumstances damages because the evidence was insufficient to support an award for such damages. In its point, Cox assigns several grounds in support of its claim of evidentiary insufficiency.

In reviewing Cox's first point, this court "accepts as true the evidence and reasonable inferences therefrom in a light most favorable to [plaintiffs] and disregards contradictory evidence." *Georgescu v. K Mart Corp.*, 813 S.W.2d 298, 299 (Mo. banc 1991). The jury is the sole judge of the credibility of the witnesses and the weight and value of their testimony and may believe or disbelieve any portion of that testimony. *Id.*

... [T]he granting of a motion for directed verdict is a drastic action by a trial court, and [it] should be done only when all of the evidence and the reasonable inferences to be drawn therefrom are *so strongly against plaintiff that there is no room for reasonable minds to differ.* (Emphasis in original.)

*Wehrkamp v. Watkins Motor Lines, Inc.*, 436 S.W.2d 698, 700 (Mo.1969). To similar effect see *McCarthy v. Wulff*, 452 S.W.2d 164, 168[3] (Mo.1970); *Losh v. Ozark Border Electric Coop.*, 330 S.W.2d 847, 851[4] (Mo.1960).

During the course of this six-day trial, which commenced on June 18, 1990, Cox's counsel made only 14 objections to evidence offered by plaintiffs, and several of those were sustained. On this appeal, except for the trial court's admitting plaintiffs' Exhibit 38, which deals only with Cox's finances, Cox has not challenged the admissibility of any of the evidence which is to be discussed. This opinion deals with the evidence which was received. It is of no moment whether some of it might have been subject to timely and proper objection. This opinion should be so viewed.

Before the evidence is reviewed, it is necessary to consider certain portions of Chapter 538,[2] dealing with tort actions based on improper health care. That chapter includes §§ 538.205 to 538.235 which were enacted in 1986, became effective February 3, 1986, and which "apply only to causes of actions arising on or after February 3, 1986." Section 538.235.

Section 538.300, enacted in 1988, lists several statutes and provides that they

---

**2.** Unless otherwise indicated, all references to statutes are to RSMo 1986, V.A.M.S., and all references to rules are to Missouri Rules of Court, V.A.M.R.

shall not apply to actions under §§ 538.205 to 538.230. One of the statutes so listed is § 510.263, which provides for a bifurcated trial, in actions involving punitive damages tried before a jury, if requested by any party.

Two days prior to the trial, Cox filed a "motion for bifurcated trial." The motion stated that it was filed pursuant to § 510.263 and requested "a bifurcated trial on the issue of punitive damages." When the motion was presented, plaintiffs' counsel said, "If they want bifurcation, they can have bifurcation."

Section 538.205 contains definitions of terms used in §§ 538.205 to 538.230, including "health care provider," "health care services," and "punitive damages." As so defined, "Health care provider" includes, among others, any hospital, or pharmacist and any other person or entity "that provides health care services under the authority of a license or certificate." "Health care services" mean "any services that a health care provider renders to a patient in the ordinary course of the health care provider's profession or, if the health care provider is an institution, in the ordinary course of furthering the purposes for which the institution is organized. Professional services shall include, but are not limited to, transfer to a patient of goods or services incidental or pursuant to the practice of the health care provider's profession or in furtherance of the purposes for which an institutional health care provider is organized." "Punitive damages" mean "damages intended to punish or deter willful, wanton or malicious misconduct."

Section 538.210.1 reads:

In any action against a health care provider for *damages* for personal injury *or death* arising out of the rendering of or the failure to render health care services, no plaintiff shall recover more than three hundred fifty thousand dollars per occurrence for noneconomic damages from any one defendant as defendant is defined in subsection 2 of this section. (Emphasis added.)

Section 538.205(7) defines "noneconomic damages" and provides that noneconomic damages "shall not include punitive damages."

Section 538.210.3 reads:

In any action against a health care provider for *damages* for personal injury *or death* arising out of the rendering of or the failure to render health care services, where the trier of fact is a jury, such jury shall not be instructed by the court with respect to the limitation on an award of noneconomic damages, nor shall counsel for any party or any person providing testimony during such proceeding in any way inform the jury or potential jurors of such limitation. (Emphasis added.)

Section 538.210.5 reads:

Any provision of law or court rule to the contrary notwithstanding, an award of punitive damages against a health care provider governed by the provisions of sections 538.205 to 538.230 shall be made only upon a showing by a plaintiff that the health care provider demonstrated willful, wanton or malicious misconduct with respect to his actions which are found to have injured or caused or contributed to cause the *damages* claimed in the petition. (Emphasis added.)

The term "willful, wanton or malicious misconduct," used in § 538.210.5, is not among the terms defined in § 538.205.

Section 538.225 provides that in any action against a health care provider for personal injury or death on account of the rendering or failure to render health care services, the plaintiff or his attorney shall file an affidavit. That statute sets forth the requirements for the content of the affidavit. In this case, plaintiffs filed such an affidavit within the time period prescribed by § 538.225 and about one year before the trial.

Section 538.225 was challenged on several constitutional grounds in *Mahoney v. Doerhoff Surgical Services*, 807 S.W.2d 503 (Mo. banc 1991), but the challenge was unsuccessful.

In reviewing the evidence, it is necessary to keep in mind that the conduct of Cox, on which the $400,000 award was based, was

that set forth in Instruction 7 and Instruction 9. That conduct consisted of the negligence [3] of Cox in failing to require its pharmacy employees to observe compounding of the cardioplegic solution.

In determining the point presented, this court considers only the conduct submitted to the jury by the foregoing instructions upon which the verdict for punitive damages was returned. *Thaller v. Skinner & Kennedy Co.*, 315 S.W.2d 124, 126[1] (Mo. banc 1958); *Guthrie v. City of St. Charles*, 347 Mo. 1175, 152 S.W.2d 91, 95[5] (banc 1941); *May v. AOG Holding Corporation*, 810 S.W.2d 655, 657 (Mo.App.1991).

There are different formulas for cardioplegic solution, and individual surgeons have preferences as to which formula they use. Dr. Avery had his own formula or recipe for the cardioplegic solution which he used. Decedent's cardioplegic solution was prepared for Dr. Avery by Cox's pharmacy, which had a prescription containing his recipe. Dr. Avery did not tell Cox how to prepare the solution. The solution was not available in a pre-mixed condition from commercial sources. The solution used during decedent's surgery did not contain the proper amount of dextrose and that fact caused her death.

The compounder is a type of pump used to measure accurately and mix fluids. This compounder was acquired by Cox in December 1987. It was a six-station compounder, which meant it could handle six fluids at a time. The compounder sat on a shelf and a control panel was mounted overhead. Four glass bottles and one plastic bag that hang over the compounder contained different solutions which may be mixed by the compounder. Each bottle or bag of a solution had a color coded plug inserted in it which corresponded with an identically colored port on the compounder. There were four solutions which were most commonly used, and one of those was D–50, a 50 percent dextrose solution which was attached to the red port.

The pharmacist uses the control panel to program the compounder. The pharmacist programs in the specific gravity of each fluid to be mixed in the final product and that number, the specific gravity, appears in the appropriate box on the control panel. Next the pharmacist programs in the volume of each fluid required. Those numbers also appear in the appropriate box on the control panel. The pharmacist then presses the recall button on the control panel to double check the numbers that have been programmed into the compounder. Then the pharmacist will press the "start" button to make the compounder begin running.

The bag into which the mixed solutions were pumped was hung by a hook on the load cell which weighed the final product. The load cell is a small rectangular arm which extends out to the right on the upright metal arm on the compounder.

The pump wheels on the compounder, which are visible through a transparent cover on the front of the compounder, revolve when the compounder operates. Each pump wheel has a white dot on it.

The manufacturer's manual for the compounder, containing its operating instructions, has a section entitled "Warnings and Cautions." One of the warnings reads: "Compounding should be monitored at the start of a cycle and at intervals thereafter to assure solutions are being transferred within acceptable limits."

The compounder contains an alarm system. The manufacturer's manual included the following: "The control module front panel serves as the focal point of all alarms and indicators. Instances which require operator attention will be signified by either flashing or blank displays, flashing or constant LED indicators, error codes and audible alarms. The following tables list the different alarms and indicators of the

---

**3.** Instruction 6, which has not been challenged, reads:

Instruction No. 6

The term "negligent" or "negligence" as used in these instructions means the failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by hospitals in the operation of pharmacies.

AUTOMIX 3 + 3 Compounder to aid in diagnosing any problems."

Judith Steffen, the perfusionist who infused the cardioplegic solution during the surgery, testified that it was not possible to determine by visual examination whether dextrose is present. "It is a clear solution." She also testified that the solution was not "end tested" after it was compounded and before it was administered to the patient. She testified that it was "probably true" that if the solution had been tested decedent would not have received "a cardioplegic solution which had no dextrose." "I wouldn't have given it, no." She said that a cardioplegic solution "is very critical." She also said that "today" every cardioplegic solution used by Dr. Avery's group of physicians is end tested by Cox as a matter of formal policy.

Glenda Adams, the pharmacist who prepared the solution, testified during plaintiffs' case-in-chief and was later called by the defense. She had prepared the solution, using Dr. Avery's recipe, over 150 times before she prepared the fatal solution. She testified that on the day she prepared the fatal solution, the compounder had been properly calibrated.

The two components for the solution were water and the D–50 dextrose solution, both of which were clear solutions. She testified she programmed the compounder for the proper amount of each component. She heard the compounder start when she pushed the start button. She then turned away from the compounder to do other work. It took approximately 10 minutes for the compounder to mix the solution and during that period she was nearby. She testified that she heard the compounder running the whole time it was operating. She said she could have heard an alarm if one had sounded.

She testified that the containers of water and the dextrose solution were hung by somebody else earlier in the day. She testified: "After the machine was programmed and the bottles were hooked up, I started the machine. Before I touched the start button, I noted what was in those bottles. When I heard the machine start, I turned away. I had other work going on at the time. My back was to the machine. I could hear the machine running the whole time it was working. If I watch the machine while it's working, and if it's working properly, you can see the pump wheels turn as the fluid is going through the machine. If you look, you can also notice the fluid levels in the two bottles change. I did watch the machine periodically through the rest of the run. I did not see the wheels turning for the dextrose bottle. I had noticed a fluid level in the bottle to start with because I wanted to make sure I had enough fluid hanging to make sure I wouldn't have to change the bottles during the run. I never watched to see whether the fluid levels changed in the bottles. When I finished the job I did not check the end levels in the bottles to see that they were different. I did not look at any time during the process to see whether the dextrose wheel was turning. If it had been the policy of the pharmacy to do those things, I would have done them."

She testified that it took about 10 minutes to make the 3,000 milliliter bag of the solution. She said, "I could either stand there for 10 minutes and watch it, or I could watch it to see that the wheels were turning, do something else, turn around and work, turn back and see that the wheels were turning and that the fluid levels were changing. I could do that. I did it through part of the run. I turned my back to do my calculations. By the time I was able to finish my calculations and turn back, the dextrose run had already completed. It was on its water cycle at that time."

She said: "I did not ever look at the machine while the dextrose cycle was being operated. I do not remember that I ever saw the dextrose wheel turning. At the end of the dextrose cycle I did not look at the dextrose bottle to see if the level had changed. If I had needed to, I would have been able to check the difference in fluid levels in the bottles."

She testified that she had never read the manufacturer's manual, although it was available in the pharmacy. She said: "Just

periodically watching does not guarantee that you know what went in the bag.... If I had looked at the level on the dextrose bottle and seen that it had not changed, it never would have left the pharmacy. If I had looked at the machine for just an instant during the dextrose cycle and seen that the machine was not turning, I would have known something was wrong, but the machine should have sounded an alarm if that wheel was not turning."

When she removed the solution from the compounder, there were 3,000 milliliters of the solution in the bag, which was the amount the compounder was supposed to produce.

Glenda testified that D–50 had a specific gravity of 1.17 which she programmed in. The specific gravity of water is 1 and she programmed that number in. She then programmed the volumes, consisting of 300 milliliters of D–50 and 2,700 milliliters of water. She touched the recall button to make sure what she had put in, and the total of the two numbers, 3,000, flashed in the box. She said it is not a very complicated procedure to mix dextrose and water. "It's a very simple one."

Nancy Stewart, a medical technologist employed by Cox, testified that "definitely" the manufacturer's instructions for computer-operated pieces of equipment should be adhered to.

Mary Richards, a medical technologist, tested the fatal solution immediately after the problems developed in the operating room. Her test showed "traces" of dextrose, but an inadequate amount. Her findings were "cardioplegic fluid glucose[4] less than 10 milligrams per deciliter." The normal rate is 5,000 milligrams per deciliter.

Kathy Tonjuk, staff pharmacist at Cox, testified that she prepared the second cardioplegic solution which was administered to the decedent after the first solution, the defective one, had been administered. She watched the compounder operate. She said you can see the pump wheels turn when the solution is going out of the D–50 bottle and that, from beginning to end, you can see the change in the fluid levels in the D–50 bottle. She saw the wheels turn and the fluid levels change. She said it takes about one to three minutes to make one of these solutions. She testified that Cox "now" has a policy for the pharmacist to observe the compounder "at least periodically during the cycle" and that there was no such policy when Glenda made the defective solution. She said that the manufacturer's manual says "that you should observe the operation of the compounder to make sure you are getting an adequate fluid transfer."

Dan Fiala, pharmacy director at Cox on the date of the death, testified that his job was to see that the pharmacy used good standard practice in dealing with solutions like cardioplegic solution. He testified that on his deposition he had stated that it was good standard practice to observe the wheels of the compounder operating. He said he was talking about that degree of skill and learning that an ordinarily careful and prudent pharmacist would have used under the same or similar circumstances. He also testified that "in light of what has happened, it is good practice now." Asked whether he required his pharmacists "to observe the operation of this compounder like the manual requires at the time [decedent's] solution was prepared," he answered, "No, Sir, they did not." He then stated that if he had provided that service, decedent would be alive today.

Fiala testified that "in light of what has happened," it is good standard pharmacy practice to end test the cardioplegic solution. He also testified that if the finished product had been end tested, decedent would "probably" be alive today.

After the fatal incident, Cox replaced the compounder with another one. There was testimony that the replacement compounder malfunctioned twice, but the malfunctions were detected by the operator, Kathy Tonjuk, because she "was watching what was going on and caught both of them."

David Rush, a pharmacist and a professor of medicine and clinical pharmacology, testified that he had reviewed the medical

4. According to the American Heritage Dictionary, "dextrose" is also called "glucose."

records of decedent. In his opinion the cardioplegic solution was compounded erroneously. He also testified that "there were inadequate controls within the pharmacy system of quality control." He further testified that in his opinion the pharmacy department at Cox was negligent and that they failed to use that degree of skill or training ordinarily used under the same or similar circumstances by members of "defendant's profession."

He testified: "You also have a machine that is designed to allow visual inspection, and part of the defined policy is, you know, that you visually watch what's going on, you don't walk away from it. You know, if part of your protective mechanism is watching how things function, watching the wheels go around to see that volume is going out of the receptacles, and the volume is going into the bag, that's part of another secondary check you have."

Defense witness Richard Hodges, a computer "trouble shooter" and a former employee of Cox, testified that biomedical equipment is similar to all types of computer equipment and that they "can and do malfunction quite regularly." He further testified that computers are susceptible to spontaneous failure from voltage irregularities. In Hodges' opinion, the compounder was capable of malfunctioning even if it had been properly programmed and the malfunction would cause it not to transfer the correct amount of solution. In his opinion the compounder did malfunction when Glenda used it to compound decedent's solution.

Hodges testified that "the very first thing" that's pumped into the container for the cardioplegic solution is the dextrose, and that the compounder would pump the dextrose "in approximately 20 seconds." He said: "All the operator [of the compounder] has got to do to see if dextrose is going in there is to stand there for 20 seconds and watch it."

Defense witness Randy Bass, a pharmacist employed by Cox, testified that cardioplegic solutions, after they have been compounded by a compounder, are now "end tested." "Every solution we make we draw a sample and send it to the lab. The cardioplegic solution does not leave the pharmacy until it's been okayed."

As grounds for its first point, Cox argues that the evidence is insufficient to support the $400,000 award because: (1) Baxter–Travenol, the manufacturer, through its factory representative, told the Cox employees that the compounder was an extremely safe, accurate and reliable machine which did not have to be watched constantly while it was operating; (2) it was proper for Cox to use the compounder to prepare the fatal solution; (3) Cox relied upon the compounder to the same extent that it relied upon other equipment used to provide critical care for patients; (4) plaintiffs' counsel stated in his opening statement that "[Cox] believes and will argue in this case, and I do not frankly disagree, that this computer is a very likely candidate for the mistake that was made"; (5) plaintiffs' expert Rush did not identify any hospital which required its pharmacists to watch a compounder while it was operating and he did not testify that Cox acted outrageously in failing to do so; (6) before decedent's death, Cox had no knowledge that the compounder could malfunction without activating any of its alarms; (7) there was no evidence that Cox knew that its pharmacy employees should watch the compounder operate.

Cox argues that the evidence is insufficient, for the foregoing reasons, to meet the standard of misconduct required for the award of punitive damages. This is so, says Cox, whether the appropriate standard is the willful, wanton or malicious misconduct standard contained in § 538.-210.5 or the "aggravating circumstances" standard contained in § 537.090, the wrongful death statute, or the "outrageous conduct" standard required in intentional tort cases, or the "conscious disregard or complete indifference" standard based on negligence.

As pointed out earlier, the term "willful, wanton or malicious misconduct," used in § 538.210.5, is not defined in § 538.205. In *Warner v. Southwestern Bell Telephone*

*Company*, 428 S.W.2d 596, 603 (Mo.1968), our supreme court said:

> The acts of a defendant which justify the imposition of punitive damages are those which are willful, wanton, malicious or so reckless as to be in utter disregard of the consequences. Such acts are clearly distinguished from negligence. While they need not always include an intent to do harm, they must show such a conscious disregard for another's rights "as to amount to willful and intentional wrongdoing."

MAI 5.01 (1981 Revision) is the instruction on damages to be given in a wrongful death action. If supported by the evidence, that instruction may include the following paragraph: "In assessing damages you may take into consideration any aggravating circumstances attendant upon the fatal injury."

"Aggravating circumstances damages are punitive in nature but are not, as with punitive damages, separately identified in the verdict. *See, Glick v. Ballentine Produce Incorporated*, 396 S.W.2d 609 (Mo. 1965)." *Blum v. Airport Terminal Services, Inc.*, 762 S.W.2d 67, 72 n. 1 (Mo.App. 1988).

The wrongful death statute, Sec. 537.-090 RSMo 1986, provides that in addition to specified damages "[t]he mitigating or aggravating circumstances attending the death may be considered by the trier of the facts...." Neither mitigating nor aggravating circumstances are statutorily defined. The courts, however, have adopted certain guidelines. Aggravating circumstances damages are punitive in nature.... It is their purpose to punish the defendant and deter future wrongdoing. *Morrissey v. Walsh Co.*, 821 F.2d 1294 (8th Cir.1987) [11]. They are in that respect akin to punitive damages. Accordingly, an award for more than compensatory damages in a wrongful death case is permissible only if the decedent would have been entitled to punitive damages had he lived. *Dougherty v. Smith*, 480 S.W.2d 519 (Mo.App.1972) [2]. *Id.* at 73.

"Submission of aggravating circumstances is proper when the defendant could have reasonably been charged with knowledge of a potentially dangerous situation but failed to act to prevent or reduce the danger." *Id.* at 73.

"The potential and seriousness of harm arising from a breach of duty is inevitably a part of the determination of whether conscious indifference to consequences has been established. The level of care required is directly proportional to the potential of harm arising from the breach." *Id.* at 74.

Although Missouri's wrongful death act does not by its express terms provide for punitive damages, Mo.Ann.Stat. §§ 537.080 *et seq.* (Vernon 1979), it does authorize the trier of fact to consider the "mitigating or aggravating circumstances attending the death." Mo.Ann. Stat. § 537.090 (Vernon 1979). Damages for "aggravating circumstances" have been permitted by Missouri wrongful death statutes since 1855, and have consistently been considered punitive or exemplary by the Missouri Supreme Court. *Parsons v. Missouri Pacific Ry.*, 94 Mo. 286, 6 S.W. 464, 466–67 (1888); *Haehl v. Wabash Ry. Co.*, 119 Mo. 325, 24 S.W. 737, 741 (1893). Damages for "aggravating circumstances" in death cases depend on proof of "willful misconduct, wantonness, recklessness, or want of care indicative of indifference to consequences," *Wiseman v. Missouri Pacific Railroad*, 575 S.W.2d 742 (Mo.App.1978), a standard commonly associated with the award of punitive damages.

*In re Air Crash Disaster Near Chicago, Ill., Etc.*, 644 F.2d 594, 606 (7th Cir.1981).

In *Burnett v. Griffith*, 769 S.W.2d 780 (Mo. banc 1989), a case involving an intentional tort, the court revised MAI 10.01 dealing with punitive damages in a situation involving intentional misconduct. One of the findings required by the revised instruction is: "[T]he conduct of defendant as submitted in Instruction Number ___ (here insert number of plaintiff's verdict directing instruction) was outrageous be-

cause of defendant's evil motive or reckless indifference to the rights of others."

The court said at 789:

Lest there be any confusion, in adopting the new instruction we do not overrule cases which have held that punitive damages require a *willful, wanton or malicious* culpable mental state. *The definitional concepts of those terms are included in the new MAI 10.01.* Moreover, we do not intend to invent any new concept as to punitive damages by including the word "outrageous" in the new instruction. An attentive observer would note that this Court cited with approval the Restatement comment that "there must be some element of outrage to justify punitive damages." *Bhagvandoss v. Beiersdorf, Inc.*, 723 S.W.2d 392, 397 (Mo. banc 1987) quoting Restatement (Second) of Torts, § 908(1) Comment b (1979). (Emphasis added.)

Instruction 7 submitted Cox's conduct on the basis of negligence. The test for this court to apply in determining whether the evidence is sufficient to submit the issue of punitive damages is whether a reasonable juror could have found that the conduct of Cox, submitted in Instruction 7—failing to require its pharmacy employees to observe compounding of the cardioplegic solution—meets the requirements of Missouri law for imposing punitive damages based on negligent conduct. *May v. AOG Holding Corp.*, 810 S.W.2d 655, 657 (Mo.App.1991).[5] See *Smith v. Courter*, 575 S.W.2d 199, 207[6, 7] (Mo.App.1978).

This case was tried in June 1990, prior to the promulgation of MAI, 4th Edition, which contains many instructions for use in actions against health care providers. Those instructions were approved by an order of the Supreme Court of Missouri entered April 9, 1991, and their use is required after January 1, 1992.

Punitive damages may be awarded in a negligence action if the defendant "showed complete indifference to or conscious disregard for the safety of others" ... [and] if the defendant "knew or had reason to know that there was a high degree of probability that the action would result in injury...."

*Stojkovic v. Weller*, 802 S.W.2d 152, 155 (Mo. banc 1991).

Though the fact situations differ, the uniform tenor of the recent cases is that punitive damages are to be the exception rather than the rule, and that they are to be confined to cases in which the evidence supports the award. The phraseology differs in different kinds of cases, but all depend on willful wrongdoing, *or recklessness which is the legal equivalent of willfulness....* (Emphasis added.)

*Menaugh v. Resler Optometry, Inc.*, 799 S.W.2d 71, 75 (Mo. banc 1990).

[A] claim for punitive damages is not inconsistent with a claim for negligence, so long as the evidence contains factual support for an award of punitive damages and the jury is properly instructed. A punitive [damage] award is not appropriate in every negligence case. Facts in addition to those relied on in the negligence submission must be established in order to recover punitive damages.

*Id.* at 74.

Punitive damage submissions do not require "clear and convincing" evidence.

*May v. AOG Holding Corp. supra*, 810 S.W.2d at 661.

Ordinarily [punitive] damages are not recoverable in actions for negligence, because negligence, a mere omission of the duty to exercise care, is the anti-thesis of willful or intentional conduct.... But an act or omission, though properly characterized as negligent, may manifest such reckless indifference to the rights

---

**5.** The court has authorized the writer to correct an error he made as author of the *May* opinion. On page 662 of *May*, nine cases were cited where evidence was held to be insufficient to support an award of punitive damages based on negligence, and seven cases were cited where the evidence was held to be sufficient. The list of seven included *Mason v. Kurn*, 145 S.W.2d 465 (Mo.App.1940). The inclusion was improper because the opinion of the court of appeals in *Mason* was quashed by the Supreme Court in *State ex rel. Kurn v. Hughes*, 153 S.W.2d 46, 54 (Mo.1941).

The writer regrets his error.

of others that the law will imply that an injury resulting from it was intentionally inflicted.... *Or there may be conscious negligence tantamount to intentional wrongdoing, as where the person doing the act or failing to act must be conscious of his conduct, and, though having no specific intent to injure, must be conscious, from his knowledge of surrounding circumstances and existing conditions, that his conduct will naturally or probably result in injury....* (Emphasis in original.)

*Hoover's Dairy, Inc. v. Mid–America Dairymen, Inc.,* 700 S.W.2d 426, 435 (Mo. banc 1985).

Instruction 7 submitted liability on the ground of specific negligence. See, generally, 9 A.L.R.3d 579 (Hospital's liability for negligence in connection with preparation, storage, or dispensing of drug or medicine.) Some of the cases discussed in that annotation involve submissions under the doctrine of res ipsa loquitur. Cases involving the liability of a hospital, under the doctrine of strict liability in tort or breach of warranty, for harm caused by a drug used in treating a patient are collected in 54 A.L.R.3d 258.

Although the significance of other evidence mentioned earlier in this opinion is not to be minimized, the evidence heard by the jury, and reasonable inferences derivable therefrom, included the following: The cause of death was the insufficiency of the dextrose as a component of the cardioplegic solution; according to the manufacturer's manual, compounding should be monitored at the start of a cycle and at intervals thereafter to assure solutions are being transferred within acceptable limits; although the compounder contained an alarm system, that fact did not, according to the manual, dispense with the need for monitoring; the solution was not end tested after it was compounded, and this was a factor which emphasized the need for proper compounding; water and D–50 dextrose solution are both clear solutions, making it impossible for a visual inspection to disclose the deficiency; by watching the compounder, the pharmacist can see the pump wheels turn as the fluid is going through the machine; Glenda Adams did not see the wheels turning for the dextrose bottle, nor did she watch to see whether the fluid levels changed in the bottles; she did not look at any time to see whether the dextrose wheel was turning; Cox had no policy requiring her to do other than what she did in operating the compounder; she had not read the manufacturer's manual, nor did Cox policy require her to read it; the dextrose in the cardioplegic solution was less than 10 milligrams per deciliter, and the proper amount was 5,000 milligrams per deciliter; it was good standard practice for the operator of a compounder to observe the wheels of the compounder operating; biomedical equipment of this type malfunctions regularly and is susceptible to spontaneous failure from voltage irregularities; the dextrose cycle, if the solution is compounded properly, requires about 20 seconds; the fact that this solution contained so little dextrose permits the inference that the wheel on the dextrose pump operated, if at all, for a period substantially less than 20 seconds.

The issue is not whether, as a matter of law, the evidence in this record entitled plaintiffs to a directed verdict for punitive damages. The issue is whether the evidence was "so strongly against plaintiff[s] that there is no room for reasonable minds to differ." *Wehrkamp v. Watkins Motor Lines, Inc., supra,* at 700.

Most of the grounds advanced by Cox in support of its first point deal with the weight of the evidence and lie within the province of the jury. Some of the sales pitches attributed to the manufacturer's representative are inconsistent with the manual. There was no claim that the mere use of a compounder is per se negligence. The degree of care Cox may have devoted to the operation of other equipment was not the applicable standard of conduct required. The remarks made by plaintiffs' counsel in his opening statement did not negate the probative effect of the evidence.

There was testimony that Cox had no policy with regard to requiring its pharmacists to observe the operation of the compounder and that such was inconsistent

with good standard practice. The testimony of Don Fiala in his deposition to that effect was not objected to, and such an objection would have been unavailing. A prior inconsistent statement of a witness who is available for cross-examination may be used as substantive evidence in civil trials. *Rowe v. Farmers Insurance Co., Inc.,* 699 S.W.2d 423[2] (Mo. banc 1985).

It is of no significance that Rush did not testify that the conduct of Cox outlined in Instruction 7 was outrageous. Such terminology is appropriate in an instruction which submits punitive damages in a situation involving intentional misconduct. Whether or not a reasonable juror is outraged is a matter for him, and not a self-anointed expert on outrageousness, to determine.

A reasonable juror could properly infer that any mechanical device is capable of malfunctioning, including the alarm system component of it. Whether the pharmacist should observe the operation of the compounder was a subject touched upon by the manual and by live testimony.

This solution was compounded for the specific purpose of using it to protect a human heart from damage while it was stopped. The potential of harm arising from miscompounding could not have been greater. This court holds that the evidence was sufficient to support an award of punitive damages within the meaning of § 538.-210.5 and for aggravating circumstances damages within the meaning of § 537.090. Cox's first point has no merit.

■ Cox's second point is that the trial court erred in giving Instructions 7, 9, 10, 12, 14, and the stage 2 verdict form because:

1. Those instructions and the verdict form contained an "unauthorized blending of punitive damages and aggravating circumstances."

2. Instructions 7 and 9 improperly submitted Cox's liability for punitive damages in that neither of those two instructions submitted the issue of Cox's scienter or culpable knowledge which is essential to an award of punitive damages in a negligence

case because neither instruction required the jury to find that Cox knew, should have known, or had reason to know, that its pharmacist had to observe compounding of the decedent's cardioplegic solution.

3. Instruction 12 and the stage 2 verdict form erroneously directed the jury to assess additional damages against Cox by expressly or impliedly telling the jury that they had to award plaintiffs some amount of additional damages and by failing to inform them that it was permissible for them to assess no additional damages against Cox.

4. Instructions 9, 10 and 14 improperly submitted "aggravating circumstances damages" because MAI 5.01 is the instruction which must be used to submit the issue of aggravating circumstances in a wrongful death action and Instructions 9, 10 and 14 deviated prejudicially from MAI 5.01 because: (a) the issue of aggravating circumstances was submitted in Instruction 9, a separate punitive damages type instruction which also defined aggravating circumstances; (b) the issue of aggravating circumstances was not submitted in Instruction 10; and (c) Instruction 14 told the jury it could award additional damages to punish Cox and deter it and others from like conduct.

Cox's brief says, "These statutes (§§ 538.210.1, 538.215.1, 538.220.1, 538.-225.1 and 538.230.1) apply to a wrongful death action brought against a health care provider.... There was never any question that the malpractice reform statutes applied to the Schroeders' wrongful death claim."

As previously pointed out, Cox, two days prior to the trial, filed a motion for a bifurcated trial on the issue of punitive damages. The motion stated it was filed pursuant to § 510.263. Section 510.263 is inapplicable to actions under §§ 538.205 to 538.-230. § 538.300. It is at least arguable that § 538.300 prohibits bifurcation for this type of proceeding against a health care provider.

Rule 66.02 authorizes a trial court, in furtherance of convenience or to avoid prejudice, or when separate trials will be con-

ducive to expedition and economy, to order a separate trial of certain matters, including any separate issue or issues. The instant two-stage proceeding was one trial before one jury. The rule does not specifically address the subject of a single bifurcated trial, although there is dictum in *State ex rel. Blond v. Stubbs*, 485 S.W.2d 152, 158 (Mo.App.1972), to the effect that such a trial is within the scope of the rule.

Cox's motion induced the trial court to utilize the bifurcated trial procedure contained in § 510.263. This created unnecessary instruction problems and prevented the use of MAI 5.01, the damages instruction to be used in a wrongful death action. A cowboy's saddle doesn't fit a two-humped camel.

Cox's second point must be considered against the foregoing background. "The general rule is that a party cannot complain on appeal of procedure which was adopted in the trial court at his own request, nor may he complain of alleged error which, by his own conduct at trial, he joined in or acquiesced." *Hilton v. Crouch*, 627 S.W.2d 99, 102[2] (Mo.App. 1982) (citing authorities).

MAI, 4th Edition, which contains many instructions for use in actions against health care providers, was not promulgated until after this case was tried. Those instructions were approved by the Supreme Court of Missouri on April 9, 1991, and their use is required after January 1, 1992.

MAI 21.01 through 21.07 contain instructions for use in actions against health care providers. The Committee Comment (1990 Revision) to MAI 21.01 says, in pertinent part, "Where suit is for wrongful death, see MAI 20.01 and 20.02." The instructions referred to are MAI 20.01 (1981 Revision), Verdict–Directing Wrongful Death Action—Single Negligent Act Submitted, and MAI 20.02 (1983 Revision), Verdict–Directing Wrongful Death Action—Multiple Negligent Acts Submitted. Neither of those two instructions addresses the subject of damages.

Sections 538.205 to 538.235 apply to causes of action arising on or after February 3, 1986, and the instant cause of action arose on May 17, 1988. Sections 538.205 to 538.230 unquestionably have some application in wrongful death actions because such actions are mentioned in § 538.210.1 and § 538.210.3, supra.

MAI, 4th Edition, promulgates some new instructions with respect to punitive damages, including MAI 10.01, dealing with intentional torts, and MAI 10.07, dealing with negligent torts in situations where MAI 10.02 (1983 Revision), dealing with negligent torts, would not be adequate. One of the situations where MAI 10.07 is to be used is where the verdict-directing instruction does not contain a submission on the issue of defendant's "knowledge." See Notes on Use (1991 Revision) to MAI 10.02.

MAI, 4th Edition, made no change in MAI 5.01 (1981 Revision), which is the damages instruction to be used in a wrongful death action. That instruction is designed for use in a one-stage trial. It is not appropriate for use in a two-stage trial such as that held here.

If MAI 5.01 had been used, the only statement made to the jury concerning punitive damages would have been this language: "In assessing damages you may take into consideration any aggravating circumstances attendant upon the fatal injury." The quoted language, an authorized insertion in MAI 5.01, if supported by the evidence, does not require additional definition.

Section 538.210.5 permits an award of punitive damages against a health care provider "only upon a showing by a plaintiff that the health care provider demonstrated willful, wanton or malicious misconduct with respect to his actions which are found to have injured or caused or contributed to cause the damages claimed in the petition."

Authorities cited in the discussion of Cox's first point equate "recklessness" with "willfulness." Missouri case law has long held that "an award for more than compensatory damages in a wrongful death case is permissible only if the decedent would have been entitled to punitive damages had he lived." *Blum v. Airport*

*Terminal Services, Inc., supra,* 762 S.W.2d at 73.

As earlier held, the evidence supported the inclusion of the "aggravating circumstances" language if MAI 5.01 could have been used by plaintiffs. That use, however, was not possible because of the bifurcation. Plaintiffs argue, not without some cogency, that the challenged instructions and verdict forms were made necessary by the bifurcation and were in fact more favorable to Cox than MAI 5.01 would have been.

Neither in its points nor in its argument does Cox make any claim that the award of $400,000 was excessive or that the evidence, if sufficient, would support an award only of a lesser amount.

This court's examination of all of the challenged instructions and verdict forms, in light of Cox's present complaints, leads it to the conclusion that the error, if any, was invited by Cox and that Cox is in no position to complain. Cox's second point has no merit.

■ Cox's third point is that the trial court erred in receiving into evidence plaintiffs' Exhibit 38, which showed Cox's "net worth" and "net income" for 1987, 1988 and 1989. For 1987 the income was a "net loss" of over $8,000,000. Cox does not challenge the accuracy of the exhibit or any of its figures, and indeed stipulated "that the following information may be read to the jury if the court determines such evidence to be admissible." The right to object to the exhibit was reserved.

When Exhibit 38 was offered, Cox objected to it on the following ground: "The law is in aggravating circumstances, that financial information is not admissible in evidence. This is irrelevant, it's inflammatory, it's prejudicial. There is no basis for offering financial worth in a case asking for aggravating circumstances in a wrongful death suit. This can only be for the purpose of inflaming the jury. The net worth of Cox should not be admitted in evidence, it is a not-for-profit hospital, and each of the items listed here is inadmissible, irrelevant and prejudicial in a claim for aggravating circumstances in a death case."

The flaw in Cox's position is the same one which afflicted its second point. On motion of Cox, the bifurcated trial procedure set forth in § 510.263 was implemented. It is not necessary to consider whether Exhibit 38 would have been admissible if Cox had not invoked § 510.263. Section 510.263.3 reads:

If during the first stage of a bifurcated trial the jury determines that a defendant is liable for punitive damages, that jury shall determine, in a second stage of trial, the amount of punitive damages to be awarded against such defendant. Evidence of such defendant's net worth shall be admissible during the second stage of such trial.

Under that statute, the "net worth" portion of Exhibit 38 was admissible, and Cox made no objection that only a portion of Exhibit 38 was inadmissible.

In *Allen v. St. Louis Public Service Company,* 365 Mo. 677, 285 S.W.2d 663, 667 (1956) the court said: "The entire back of Exhibit 6E was read in evidence. A blanket objection was made to the entire offer. Indeed, the allegation of error here is directed at the whole exhibit, as offered. If any part or parts of the exhibit were admissible, the objections were properly overruled." To similar effect see *Crockett v. Schlingman,* 741 S.W.2d 717, 718[1] (Mo. App.1988).

Cox's third point has no merit.

The judgment is affirmed.

PARRISH, P.J., and SHRUM, J., concur.